UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALEB AVERY T'BEAR,

        Plaintiff,

    v.

BARRY FORMAN,

        Defendant.

Case No. 17-cv-00796-JSC

**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT; CROSS MOTIONS FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS; DEFENDANT'S MOTION FOR SANCTIONS; AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

Re: Dkt. Nos. 99, 101, 103, 111, 134

Plaintiff Caleb Avery t'Bear sued Defendant Barry Forman in California state court for breach of fiduciary duty, declaratory relief, and an accounting arising out of a failed business venture.[1] (Dkt. No. 1-1.)[2] Defendant removed the action to this Court pursuant to 28 U.S.C. § 1441(b), based on diversity jurisdiction under 28 U.S.C. § 1332. (Dkt. No. 1 at ¶ 4.) Defendant subsequently brought counterclaims for breach of loan agreements, rescission, and in the alternative, equitable relief. (Dkt. No. 84.) Now pending before the Court are Defendant's motion for summary judgment on Plaintiff's complaint, (Dkt. No. 103), the parties' cross motions for summary judgment on Defendant's counterclaims, (Dkt. Nos. 99 & 101), Defendant's motion for sanctions, (Dkt. No. 111), and Plaintiff's "motion to allow motion for leave to amend filing of amended affirmative defenses," (Dkt. No. 134). After careful consideration of the parties' briefing, and having had the benefit of oral argument on January 31, 2019, the Court GRANTS

1   Defendant's motion for summary judgment on Plaintiff's complaint, DENIES in part and

2   DEFERS in part pending supplemental briefing Defendant's motion for summary judgment on

3   Defendant's counterclaims, DENIES Plaintiff's cross motion for summary judgment on

4   Defendant's counterclaims, DENIES Defendant's motion for sanctions, and DENIES Plaintiff's

5   motion for leave to amend.

6   **BACKGROUND**

7   **I.     Factual Background**

8       **A.     FairWay**

9         Beginning in 2006, the parties discussed plans for creating "a series of affiliated domestic

10   and foreign companies" referred to by Plaintiff as "The FairWay Group" ("FairWay"), to monetize

11   intellectual property (the "FairWay IP") developed by Plaintiff "for pricing offerings of securities

12   and other assets." (Dkt. Nos. 1-1 at ¶ 6; 29 at ¶ 6; 99-1 at ¶ 3.) The entities involved include,

13   "Urso Ltd (a Belize company) ("Urso"), FairWay IP Holdings, Ltd (a Cayman Island company)

14   ("FairWay IP Holdings"), FairWay Financial U.S., Inc. (a Delaware company), FairWay Pricing

15   Technologies, LLC (a Delaware company) [("FairWay Pricing")], and FairWay International Kft[3]

16   (a Hungarian company)." (Dkt. No. 99-1 at ¶ 3.)

17       In May 2008, Plaintiff "assigned to Urso as corporate assets all personal patents,

18   trademarks, and business plans related to FairWay inventions or businesses." (Dkt. No. 99-4, Ex.

19   44 at 7.) In December 2011, Plaintiff transferred ownership of the FairWay IP from Urso to

20   FairWay IP Holdings. (Dkt. No. 99-4, Ex. 55 at 165.) Prior to August 2016, Plaintiff held a 100%

21   ownership interest in Urso; Plaintiff currently owns 25% of the company and remains its

22   president.[4] (Dkt. No. 99-8, Ex. C at 59:11-22, 60:19-21.) Urso owns 100% of FairWay IP

23   Holdings, which owns 100% of the FairWay IP. (Dkt. No. 99-8, Ex. C at 64:2-23.)

24       **B.     The Loans**

25         Between April 2006 and October 2011, Defendant made 33 loans to Plaintiff—in the form

26

27   [3] FairWay International Kft has been defunct for approximately two years. (*See* Dkt. No. 99-8 at 60:3-20.)

28   [4] During his deposition, Plaintiff refused to identify the owners holding the remaining 75% interest in Urso, referencing a nondisclosure agreement. (Dkt. No. 99-8, Ex. C at 59:1-25.)

2

of promissory notes—to fund FairWay.[5]  (Dkt. No. 99-1 at ¶ 5.)  The notes list Defendant as the "Purchaser" or "Lender."  (Dkt. Nos. 99-1 at ¶ 5; 99-2, Ex. 1-33.)  Thirty-one of the notes list Plaintiff as the "Borrower," and the other two list FairWay Pricing Technologies, LLC and FairWay International Kft, respectively.[6]  (Dkt. No. 99-2, Ex. 1-33.)  All but one of the notes contain Plaintiff's signature.  (*Id.*)  The notes were secured by the general assets of Plaintiff and the FairWay IP held by Urso, with the principal and interest payable by Plaintiff upon demand.  (Dkt. Nos. 1-1 at ¶ 10; 29 at ¶ 10; 99-4, Ex. 44 at 7, Ex. 51 at 56, Ex. 53 at 114.)  Two of the notes are governed by Delaware state law, (*see* Dkt. No. 99-2, Exs. 1-2); the parties do not dispute that all other notes are governed by California state law.

The total outstanding principal of the notes is approximately $551,433.[7]  The annual interest rate on the FairWay Pricing Technologies, LLC note is 8%; the FairWay International Kft note does not provide for interest.  (*See* Dkt. No. 99-2, Ex. 1 at 9; Ex. 25 at 98.)  All other notes provide for an annual interest rate of 10%.[8]

//

---

[5] There is no dispute that Defendant made more than 33 loans to Plaintiff; however, Defendant's motion for summary judgment on Defendant's counterclaims seeks recovery for only 33 specific loans.

[6] Plaintiff signed the note for FairWay Pricing Technologies, LLC, both as a "Chairperson Executive Committee Manager/Member" of FairWay Pricing and as "an individual, Guarantor." (Dkt. No. 99-2, Ex. 1 at 15.)  The note reflecting the "Loan Agreement" between Defendant and FairWay International Kft, which is signed by Defendant and unsigned by Plaintiff, contains a signature line for "Caleb Avery t'Bear" for FairWay International Kft.  (Dkt. No. 99-2, Ex. 25 at 98.)  Defendant attests that the loan was consummated on December 3, 2007, (Dkt. No. 99-1 at ¶ 33), and although unsigned, Plaintiff does not appear to dispute that the FairWay International Kft note reflects a valid loan from Defendant to Plaintiff, (*see e.g.*, Dkt. No. 1-1 at ¶ 9aa (listing a loan between the parties on December 3, 2007); Dkt. No. 99-4, Ex. 49 at 28 (February 2011 email from Plaintiff to Defendant containing "Loan Manager" listing "Personal Loans – Forman to Avery," including December 3, 2007 loan of $10,000 for "Deloitte Hungary Bill/direct wire (not exact)"; Dkt. No. 101-4, Ex. A at 76.)

[7] The FairWay International Kft note is in the amount of 6,000 Euros.  Defendant attests that at the time of the loan on December 3, 2007, the amount in U.S. dollars was $8,932.80.  (Dkt. No. 99-1 at ¶ 33.)  Defendant further submits the declaration of Travis Armstrong, a Certified Public Accountant licensed in California, who also lists the principal amount of the FairWay International Kft note as $8933.  (Dkt. Nos. 99-5 at ¶ 2-3; 99-6, Ex. A at 3.)  Plaintiff does not appear to dispute Defendant's valuation, although Plaintiff's complaint lists the amount of the December 3, 2007 note as $10,000.  (*See* Dkt. No. 1-1 at ¶ 9aa.)

[8] The August 11, 2006 note for $135,000 provides for compound interest, (Dkt. No. 99-2, Ex. 2 at 25), all other interest-bearing notes provide for simple interest, (Dkt. No. 99-2, Exs. 1, 3-24, 26-33).

### 1. "Loan Managers"

Between June 2007 and February 2016, Plaintiff sent Defendant 19 emails attaching spreadsheets from a file entitled "Barry Forman Loan Manager"; the spreadsheets include a summary page entitled "Personal Loans – Forman to Avery," listing "Accumulated Loans with interest." (*See* Dkt. No. 99-3, Ex. 34-43, 45-53.)  The Loan Managers list the dates of the notes, beginning with the August 2006 note,[9] the principal loan amount, and the principal plus accrued interest.  Beginning with the March 2008 Loan Manager, Plaintiff includes the following:

> All principle and interest is due and payable on demand by Nathaniel Caleb Avery
> To the extent any collateral is held by Urso Limited [also owned by Avery], that collateral is pledged as well [to the extent necessary to fully repay both principle and interest]
>
> Signed by Nathaniel Caleb Avery both individually
> and as Chairman and CEO of Urso Limited.
> on behalf of Urso, Ltd.
> Marina Towers, Suite 302,
> Newtown Barracks,
> Belize City, Belize
>
> N. Caleb Avery
> [signed under the Electronic Signatures Act of 2000 [Public Law No: 106-229]] and legally binding upon all his assignees and heirs

(Dkt. No. 99-3, Ex. 40 at 67 (bracketed language in original).)  On February 29, 2016, Plaintiff sent Defendant the last Loan Manager; it references all 33 of the notes at issue.  (Dkt. No. 99-4, Ex. 53 at 113-159.)  The February 2016 Loan Manager removes the language above regarding collateral held by Urso, and states, in pertinent part:

> All principle and interest is due and payable on demand by Nathaniel Caleb Avery
>
> Signed by Nathaniel Caleb Avery both individually
> and as Chairman and CEO of Urso Limited.
> on behalf of Urso, Ltd.
> 35 New Road
> Belize City, Belize

---

[9] Beginning with the December 2011 Loan Manager, Plaintiff included a reference to the April 2006 "$100K Convertible Debt Note with FairWay Pricing Technologies," and represented that "Nathaniel Caleb Avery and Urso Ltd will take personal and corporate responsibility to the extent that Note is not repaid by FairWay Pricing Technologies according to its terms."  (*See* Dkt. No. 99-4, Ex. 51 at 53.)

> **Also includes $100K Convertible Debt Note with FairWay Pricing Technologies which Nathaniel Caleb Avery and Urso Ltd will take personal and corporate responsibility to the extent that Note is not repaid by FairWay Pricing Technologies according to its terms.

(*Id.* at 114.)

### 2. Memorandum of Understanding

In December 7, 2011, Plaintiff emailed Defendant[10] a "Memorandum of Understanding" ("MOU") reflecting a discussion between the parties to reconfigure the "payout plan" for the notes at issue so that Plaintiff could obtain $6 million in funding for FairWay through the sale of notes secured by the FairWay IP. (Dkt. No. 99-4, Ex. 51 at 39-56.) In the cover email, Plaintiff states, in pertinent part: "As you, [Defendant], and I, discussed, as part of the paperwork Urso Ltd. is assigning the FairWay IP portfolio to an IP Holding company, FairWay IP Holdings Ltd. to securitize the $6M in Notes being offered." (*Id.* at 39.) The attached MOU states, in pertinent part:

> Some of the individual Notes in the series have pledged my general and entire asset base [including patents assigned to Urso Ltd.] as collateral. ***As we discussed, as part of our current fundraising, the FairWay Intellectual Property (patents, trademarks, etc.) is being assigned from Urso Ltd. to FairWay IP Holdings Ltd. [Cayman Islands]. To complete that assignment, I would ask you to accept and confirm your understanding that Urso Ltd. would not have direct control over these Intellectual Property assets but continue to have indirect rights to them through its 100% sole ownership of FairWay IP Holdings.*** Specifically, while Urso would no longer have direct title to these assets, it would have rights to the cash flow from the licensing of those assets [net of FairWay IP Holdings obligations to maintain them (legal costs, filing fees, annuities, etc.)], such cash to be received as expense reimbursements or dividends from FairWay IP Holding to Urso. ***In summary, your lien interest [per the Notes] would continue on my general assets including: 1) my 100% ownership of Urso Ltd.; 2) by proxy, Urso Ltd.'s majority ownership of FairWay International; 3) my shares in FairWay Financial U.S., Inc.; and 4) general assets. But it would specifically no longer include direct lien on FairWay***

[10] The cover email is addressed to Defendant and a third party (Jack Russi) who had also loaned money to Plaintiff. (*See* Dkt. No. 99-4, Ex. 51 at 39.) The attached MOU is addressed solely to Defendant. (*See id.* at 56.) In opposition to Defendant's motion for summary judgment on Defendant's counterclaims, Plaintiff submits an unsigned copy of an MOU with identical terms that is dated August 6, 2012. (*See* Dkt. No. 116-4, Ex. M at 3.) Plaintiff provides no cover email with this MOU to verify that the date is accurate. Further, and as discussed below, Defendant signed and returned the December 2011 MOU to Plaintiff via email on December 12, 2011. (*See* Dkt. No. 99-4, Ex. 55 at 164-65.)

5

***Intellectual Property, but rather depend on Urso's sole ownership
of FairWay IP Holdings for repayment of the Notes.*** The Notes
(2006-2011), as a series, are amended to that understanding.

(*Id.* at 56 (bracketed language in original) (emphasis added).) Defendant attests that:

> [Plaintiff] told me that in order to consummate the transaction [for
> the $6 million in new funding], he needed a "carve out" of my direct
> security interest in the FairWay IP. In return, my loans would be
> repaid by the end of 2012, and I would retain my security interest in
> all of his other general assets, including, but not limited to, his 100%
> ownership in Urso.

(Dkt. No. 99-1 at ¶ 64.) Indeed, Plaintiff's cover email states, in pertinent part: "For clarity sake, I am attaching the current Loan Manager summarizing all personal Notes outstanding from me to you and a Memorandum of Understanding outlining the carve out of the IP in the general liens on my property to now accommodate the indirect control of the IP." (Dkt. No. 99-4, Ex. 51 at 39.) Plaintiff's cover email also states that pursuant to "[t]he payout plan," Plaintiff would pay Defendant his balance within six months, "with a small balance by year-end 2012." (*Id.*) Defendant signed and returned the MOU to Plaintiff on December 12, 2011. (Dkt. No. 99-4, Ex. 55 at 164-65.)

### 3.     Demand Notice

On May 17, 2017, Defendant sent Plaintiff a demand letter, calling for the immediate payment of principal and interest on all outstanding loans; "specifically, those loans listed in [Plaintiff's] document entitled "Loan Manager – Barry Forman – 31 Dec 2016" . . . as well as any and all other loans or advances from [Defendant] to [Plaintiff] or to any of [Plaintiff's] affiliate companies." (Dkt. No. 99-2, Ex. B at 5.) The letter demanded payment by May 31, 2017. (*Id.*) Plaintiff did not respond to Defendant's demand, and on June 12, 2017, Defendant sent Plaintiff written notice via email and certified mail that "Plaintiff failed to make any payment of principal and interest as demanded by [Defendant's]" May 2017 letter. (Dkt. No. 99-2, Ex. C at 7.)

### C.     The "Partnership"

#### 1.     Preliminary Collaboration Agreement

On January 25, 2010, Defendant proposed terms for a potential partnership to Plaintiff by sending Plaintiff a "[f]irst draft of a partnership term sheet." (Dkt. No. 103-2, Ex. K. at 176.)

The term sheet includes several questions related to tax issues. (Dkt. No. 103-2, Ex. K at 177-78.) On March 9, 2010, Plaintiff responded to Defendant's proposal by emailing Defendant a "[f]irst draft" of a document entitled "Preliminary Collaboration Agreement." (Dkt. No. 103-2, Ex. E at 146.) Plaintiff's cover email noted that the draft "needs a bit of work." (*Id.*) The attached document states, in part:

> This Preliminary Collaboration Agreement is intended to set forth the basic terms of agreement by which Barry Forman ("Forman") is partnering with Caleb Avery t'Bear ("t'Bear") in implementing the FairWay business model, as described in the Executive Summary for FairWay Financial U.S. and including the establishment of FairWay International and its operating companies.

(*Id.* at 147.) The draft "acknowledge[s] the preliminary nature of the agreement," and states that "as soon as practicable," the parties would "engage legal counsel experienced in the preparation and counseling regarding business partnership agreements to prepare a complete agreement covering, among other things, the terms and conditions set forth [t]herein."[11] (*Id.*) The Preliminary Collaboration Agreement includes the heading "Rough Draft for Caleb's Review," a bracketed question regarding "repurchase rights upon [Defendant's] death," brackets indicating forthcoming "[t]ext" regarding compensation, and a blank space regarding the percentage of equity participation in FairWay operating companies that Defendant would receive "[a]s consideration for [the] performance of his duties." (*Id.* at 147-49.) The draft is not signed by either party and does not include a date.

In addition to the Preliminary Collaboration Agreement, on March 9, 2010 Plaintiff forwarded to Defendant an email to Plaintiff from his then-attorney, Tim Covington.[12] (*Id.* at

---

[11] The Preliminary Collaboration Agreement provides that prior to a "more complete agreement, . . . any issue regarding the interpretation of the agreement" would be resolved by a panel of three attorneys (one appointed by each party and a third selected by the parties' respective attorneys). (Dkt. No. 103-2, Ex. E at 147.) In the event the panel could not informally resolve the issue, the draft agreements states that it would be submitted to JAMS (Judicial Arbitration and Mediation Services) in San Francisco, California. (*Id.*) Further, the draft states that California state law governs the agreement. (*Id.*)

[12] The Court previously held on July 18, 2018 that Plaintiff waived privilege regarding communications with Mr. Covington, (Dkt. No. 83 at 1), and Plaintiff did not file a motion for reconsideration of the Court's order. Plaintiff acknowledged during his deposition on July 26, 2018 that he waived privilege to those communications. (Dkt. No. 11-3, Ex. B at 8 ("I gave up on that and just waived privilege.").)

United States District Court
Northern District of California

146.) Upon reviewing Defendant's partnership term sheet, Mr. Covington wrote, in pertinent part:

> "Partnership" conveys possibly unknown rights and liabilities, as there is an entire body of partner law. Also you do not want to give Barry all of the rights you currently hold as Fairway's founder. My recommendation is to call this a collaboration agreement and then to make clear that Barry is, to an extent, an at will employee and doesn't have rights to control the formation of the various FairWay affiliates (he talks about ownership structure of UMS, etc. as if he would have some say in control of UMS, which I don't think is your intent).

(*Id.*) Indeed, the Preliminary Collaboration Agreement designates Defendant's "Executive Role" as "CEO of FairWay Financial US and other FairWay operating companies," and states that Defendant "will be employed at will and may be terminated at any time upon notice with or without cause." (*Id.* at 148.)

The next day, Plaintiff sent Defendant an email with the subject line "Merged draft agreements," with "[d]raft 3" of the Preliminary Collaboration Agreement attached. (Dkt. No. 103-2, Ex. M at 186.) The email states, in pertinent part:

> I merged both drafts. We still need to compare against [Defendant's] draft term sheet and also need a section as to the formula(s) applied to calculate the initial founder's calculation of each [operating company]. I will also go back and look at [Defendant's] draft to see if we have missed anything else.
>
> But this is a good initial start.

(*Id.*) The third draft includes the heading "Rough Draft for Caleb's Review," and contains the same bracketed question regarding repurchase rights, bracket denoting forthcoming text regarding compensation, and blank space regarding equity participation as the initial version. The draft also inserts a new non-compete clause stating:

> [Defendant] agrees not to compete with t'Bear, Urso or FairWay in any manner central to their business plans for a period of 5 years after leaving the employment of FairWay Financial US, FairWay International and/or other Fairway operating companies, as the case may be[.]

(*Id.* at 188.) The draft includes another new clause stating, pertinent part:

> <u>Complete Agreement</u>.   Forman and t'Bear agree to cooperate to ensure that this Agreement is superseded by a complete form of agreement ("Complete Agreement") covering its subject matter within six (6) months of the effective date set forth below.

(*Id.* at 189.)  The draft also includes a clause regarding liability under the agreement, stating, in

pertinent part:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE, UNDER ANY LEGAL OR EQUITABLE THEORY, TO THE OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES OF ANY KIND AS A RESULT OF OR ARISING FROM THIS AGREEMENT AND WEHTHER [sic] OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(*Id.* at 190.)  As with the initial version, the third draft is not signed by either party and does not

include a date.

On March 27, 2010, Plaintiff sent Defendant an email with the subject line "updated

partner draft."  (Dkt. No. 103-2, Ex. O at 203.)  The "Compensation" section of the attached draft

includes for the first time a formula for determining the parties' "share equity set forth in each

major operating company set aside for founders at the time the company is established."  (*Id.* at

205.)  The section includes bracketed questions regarding the formula, including one stating:

> How would the [partnership pool] be split up as a practical matter? Not equally, as per [Defendant's] draft term sheet, I think; since, different "Partners" would be bringing different things to the table and awarded shares in differing amounts accordingly. We need to discuss.

(*Id.* at 206.)  The version again includes the heading "Rough Draft for Caleb's Review" and

contains the same bracketed question regarding repurchase rights found in the previous drafts.  (*Id.*

at 204, 207.)  Also like the previous versions, the March 27 draft is not signed by either party and

does not include a date.

On June 5, 2011, Plaintiff emailed Defendant stating that Plaintiff was "looking for the

most current draft of the partnership proposal."  (Dkt. No. 103-2, Ex. P at 217.)  Minutes later,

Plaintiff sent Defendant an email with the subject line "Partner Agmt" that included the "last draft

[Plaintiff] had from Tim [Covington]."  (Dkt. No. 103-2, Ex. Q at 221.)  Plaintiff's email notes

that the draft "seems incomplete to sign and the partnership formula is not really spelled out as we

have in excel spreadsheets."  (*Id.*)  Further, the email states:

> Can you work with Tim and I to get this in better form and then we can give the legal/tax advisors something better to work with[?] Just

> to document our most recent discussion/agreement about the formula (and the attached draft), we are making the following structural change (with your approval) [to the repurchase period and the "FairWay Group compensation pool set-aside].

(*Id.*) The attached Preliminary Collaboration Agreement does not contain the "partnership formula" contained in the March 27 draft's "Compensation" section but does include the heading "Rough Draft for Caleb's Review" and the previous versions' bracketed question regarding repurchase rights. (*Id.* at 222, 224.) Once again, the draft is not signed by either party and it does not include a date.

### 2.    Defendant's Exit from FairWay

On September 21, 2015, Defendant sent an email to Plaintiff with the subject line "Transition." (*Id.* at 9.) The email states, in pertinent part:

> Last March, you asked that I level with you regarding ***our partnership in FairWay***.
>
> . . . Consequently, Caleb, ***I am no longer able to proceed as your partner***. Serving in a lesser capacity may be possible, perhaps, as, say, strategic advisor on the group level or some such that would entail a minor time commitment.
>
> . . . Obviously there are issues that need addressing, such as timing, debt repayment, informing the team, documentation and the like. We can begin dealing with those. I intend to transition honorably and professionally.

(*Id.* (emphasis added).) In January 2016, Plaintiff and Mr. Covington collaborated on a draft letter to "memorialize [Defendant's] withdrawal from the FairWay Group." (Dkt. No. 103-2, Ex. C at 115.) The letter states, in part:

> It is with both sadness and understanding that I read the letter by which you stepped down as Chairman of the FairWay Group. They say that no one is irreplaceable. But I know this does not apply to you in this case. I cannot think of anyone who can provide the resources and loyalty you have provided and which have been critical in keeping FairWay and our dream for it alive.

(Dkt. No. 103-2, Ex. R at 233.) The draft letter includes sections entitled: "Terminating Prior Equity Arrangements"; "Loan Obligations Unaffected"; "Retroactive Compensation"; "Expense Reimbursement"; "Ongoing Consultation"; and "Miscellaneous." (*Id.* at 233-236.) The parties

continued to negotiate regarding Defendant's exit and the repayment of his loans, and at some

point in February or March 2016, Defendant informed Plaintiff "that if [Defendant] were not

repaid by the end of 2016, [Defendant would need to have [his] original security interest in the

FairWay IP restored." (Dkt. No. 99-1 at ¶ 72.) Negotiations broke down, as reflected in an email

from Plaintiff to Defendant on March 7, 2016, wherein Plaintiff states that Defendant "bargained

hard" for a "full partnership," and "with those rewards come obligations, particularly to lead the

charge for funding so all the pieces could be put in place and creditors (including the Forman

loans) could be paid." (Dkt. No. 103-2, Ex. S at 238.)

On April 10, 2016, Mr. Covington emailed Plaintiff a proposal detailing an "alternative"

loan repayment structure that included granting Defendant a "security interest . . . under an

omnibus collateral agreement." (Dkt. No. 103-2, Ex. T at 247.) Plaintiff refused, stating: "I am

still open to this [creative]; but not with security interest – non-starter [he can fuck us at the finish

line]." (*Id.* (bracketed language in original).) Mr. Covington responded by email the next day,

stating, in pertinent part:

> As for the security interest, it seems you and [Defendant] will never
> see eye to eye. I have to confess, though, that if there is
> subordination to future investors, why a security interest is a "non-
> starter" as you put it. If you don't move on this, then the odds of
> reaching an agreement are slim to none. Tell me this: When
> [Defendant] gave you 45 loans, why were you willing to let each
> and all of them be subject to security interest but not now?

(*Id.* at 246.) Negotiations between the parties continued, with Defendant seeking restoration of his

security interest in the FairWay IP. On August 7, 2016, Mr. Covington emailed Plaintiff,

suggesting that the "4 Urso shareholder scenario at 25% . . . could be a key to thwarting

[Defendant's] attachment of the assets." (Dkt. No. 103-2, Ex. Y at 270.) On or about that date,

Plaintiff sold or transferred 75% of his ownership interest in Urso to unnamed parties. (Dkt. No.

99-8, Ex. C at 59:11-22.) Plaintiff did not notify Defendant of this transfer. The parties continued

discussions regarding a forbearance agreement throughout 2016 and up until January 2017, when

Defendant was served with Plaintiff's state court complaint. (Dkt. No. 99-1 at ¶ 72.)

## II.     Procedural History

Plaintiff filed this action in Superior Court of the State of California, County of Alameda,

on January 17, 2017. (Dkt. No. 1-1 at 2.) Defendant removed the action to this Court on February 17, 2017, based on diversity jurisdiction. (Dkt. No. 1.) Thereafter, Defendant moved to dismiss the complaint, (Dkt. No. 5), and Plaintiff moved to remand the action to state court, (Dkt. No. 12). The Court denied both motions on April 28, 2017. (Dkt. No. 22.) With the Court's permission, Defendant filed an amended answer and second amended counterclaim on July 19, 2018. (Dkt. No. 84.)

On October 4, 2018, Defendant filed motions for summary judgment on his counterclaims, (Dkt. No. 99), and Plaintiff's complaint, (Dkt. No. 103). Plaintiff filed his motion for summary judgment on Defendant's counterclaims that same day, (Dkt. No. 101). The motions for summary judgment are fully briefed.

Defendant filed the instant motion for sanctions on October 12, 2018. (Dkt. No. 111.) Plaintiff did not file an opposition. On January 7, 2019, Plaintiff moved, purportedly under Federal Rule of Civil Procedure 36, to "allow motion for leave to amend filing of amended affirmative defenses by Plaintiff." (Dkt. No. 134.) Defendant opposes Plaintiff's motion. (Dkt. No. 135.) The Court heard oral argument on all motions on January 31, 2019.

## PRELIMINARY ISSUES

### I. Evidentiary Objections

Both parties submit evidentiary objections outside of their opposition or reply briefing regarding evidence proffered by the opposing party in support of, or opposition to their respective motions for summary judgment. (*See* Dkt. Nos. 121 & 124.) Defendant's objections span 32 pages. (*See* Dkt. No. 124.) These separate filings violate Civil Local Rules 7-3(a),(c), which require that "[a]ny evidentiary and procedural objections to the [motion or opposition] must be contained within the [opposition or reply] brief or memorandum."[13] The Court will thus "only address the evidentiary arguments to the extent they are raised" in the parties' opposition or reply

---

[13] Defendant submitted a "response" to Plaintiff's separately-filed evidentiary objections on November 8, 2018. (Dkt. Nos. 125.) Thereafter, Plaintiff submitted a "reply" to Defendant's response. (Dkt. No. 128.) On January 29, 2019, Plaintiff submitted another reply to Defendant's separately-filed evidentiary objections. (Dkt. No. 137.) These filings also violate the Local Rules and the Court will not consider them. *See* Civil L.R. 7-3(d).

briefs.  *See Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (denying defendant's separately-filed motion to strike based on a similar violation of Local Rule 7-3(c)).  Accordingly, the Court overrules the parties' objections to the extent they are raised outside their opposition or reply briefs.

Defendant also submitted evidentiary objections, (Dkt. No. 126), to evidence Plaintiff submitted with his reply in support of Plaintiff's cross-motion for summary judgment on Defendant's counterclaims, (Dkt. No. 120).  Under the Local Rules:

> If new evidence has been submitted in the reply, the opposing party may file within 7 days after the reply is filed, and serve an Objection to Reply Evidence, ***which may not exceed 5 pages of text***, stating its objections to the new evidence, ***which may not include further argument on the motion***.

Civil L.R. 7-3(d) (emphasis added).  Again, Defendant's submission fails to comply with the Local Rules.  First, it contains over two pages of argument regarding how certain of Plaintiff's positions are unsupported by evidence or contradicted by other testimony.  Such argument is not an objection to evidence.  Second, it exceeds the 5-page limit by 5 pages.  Based on Defendant's failure to comply with the Local Rules, the Court will not consider this filing.

## II.     Requests for Judicial Notice

### A.     Defendant's Request

Defendant asks the Court to take judicial notice of an adjudicative fact pursuant to Federal Rule of Evidence 201(b)(2).  (Dkt. No. 100.)   Under Rule 201(b)(2), a judicially noticed adjudicative fact must be one "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  Here, Defendant seeks "judicial notice of the fact that the Federal Reserve Discount Rate on April 28, 2006, was 5.75%."  (Dkt. No. 100 at 2.)  In support of this fact, Defendant submits two printouts from the "website of the Board of Governors of the Federal Reserve System"[14] demonstrating that the discount rate was set at 5.75% on April 10, 2006.  (Dkt.

---

[14] The printouts are from the following webpages: (1) https://www.federalreserve.gov/monetarypolicy/discountrate-archive.htm; and (2) https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20060606a1.pdf.  (*See* Dkt. Nos. 100 at 2; 100-1 at 2-6; 100-2 at 2-5.)

No. 100 at 2.)  Plaintiff has not opposed judicial notice of these documents or otherwise disputed their authenticity.  Accordingly, the Court grants judicial notice of the fact that the Federal Reserve discount rate was 5.75% on April 28, 2006 because it is an undisputed "matter of public record."  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

### B.     Plaintiff's Request

Plaintiff requests judicial notice of the following facts in support of his cross-motion for summary judgment on Defendant's counterclaims: (1) "Federal Reserve discount rates during the period of March 2006 through October 2011"; and (2) "that over sixty (60) days have elapsed since May 22, 2018 and [Defendant] continues to seek principal and interest on the promissory notes referenced in the Second Amended Complaint." (Dkt. No. 101-14 at 1.)  Plaintiff provides no documents in support of his request, however, to the extent relevant, the Court grants judicial notice of the requested facts.

## DISCUSSION

### I.     Defendant's Motion for Summary Judgment on Plaintiff's Complaint

On summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Where the movant does not bear the burden of proof at trial for the underlying claims, it satisfies its burden if it can show that there is an absence of evidence to support "an element essential to [the nonmovant's] case, and on which [the nonmovant] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Defendant has done so.

### A.     Breach of Fiduciary Duty

"The elements of a claim for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 483 (Cal. Ct. App. 1998).  Defendant insists that summary judgment on Plaintiff's cause of action for breach of fiduciary duty is warranted because a partnership agreement was never "reached, finalized, formalized, dated or executed," and therefore, Defendant owed no fiduciary duty to Plaintiff. (Dkt. No. 103 at 19-24.)  Further, Defendant insists that even if a partnership existed, there is no evidence that

Defendant breached a fiduciary duty or that such a breach caused damages to Plaintiff. (*Id.* at 24-30.)

### 1. Existence of a Partnership

Plaintiff alleges that Defendant owed him a fiduciary duty based on the formation of a partnership between the two to operate FairWay. Under California law, a partnership is defined as "the association of two or more persons to carry on as co-owners a business for profit . . . whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a). A partnership need not be formed by written agreement. *See* Cal. Corp. Code § 16101(10) (defining "partnership agreement" as "the agreement, whether written, oral, or implied, among the partners concerning the partnership"). The "intent of the parties revealed in the terms of their agreement, conduct, and the surrounding circumstances" is the "crucial factor" in "determining whether a partnership exists." *Holmes v. Lerner,* 74 Cal. App. 4th 442, 454 (Cal. Ct. App. 1999).

There is no dispute that Defendant proposed terms of a partnership to Plaintiff in January 2010, that Plaintiff responded with the Preliminary Collaboration Agreement on March 9, 2010, and that Plaintiff sent another draft the following day that purportedly "merged both drafts," (*see* Dkt. No. 103-2, Ex. M at 186). There is a dispute, however, as to the effect of the March 10th draft of the Preliminary Collaboration Agreement. Plaintiff testified that the parties "agreed on March 10th . . . that we were partners," based on the terms of the March 10th draft. (Dkt. No. 103-2, Ex. A at 27.) Plaintiff further testified that the parties then "proceeded through a course of conduct as partners." (*Id.*) The draft partnership agreement, together with Plaintiff's testimony and the parties' course of conduct gives rise to a genuine dispute of fact regarding the formation of a partnership.

On January 12, 2012, Defendant forwarded to Plaintiff an email from a potential investor in FairWay, asking: "What's your take, partner?" (Dkt. No. 115-2 at 6.) On December 2, 2012, Plaintiff emailed Defendant regarding FairWay, stating in pertinent part:

> You are doing the right things and let's hit this on all cylinder[s], real emphasis now. ***This is what I expected of you when you became my partner***. . . . I am glad in this case that ***you are rising to the occasion and being a true partner***. My faith in you is realized and renewed. ***You are someone I am proud to be partnered with***.

(Dkt. No. 115-2 at 4 (emphasis added).) Defendant responded on December 3, 2012, stating, in pertinent part: "***We're a team, partners you and I***. I have every intention of living up to the confidence you place in me." (*Id.* (emphasis added).)

As previously discussed, Defendant sent an email to Plaintiff in September 2015 with the subject line "Transition." (*Id.* at 9.) The email states, in pertinent part:

> Last March, you asked that I level with you regarding ***our partnership in FairWay***.
>
> . . . Consequently, Caleb, ***I am no longer able to proceed as your partner***. Serving in a lesser capacity may be possible, perhaps, as, say, strategic advisor on the group level or some such that would entail a minor time commitment.
>
> . . . Obviously there are issues that need addressing, such as timing, debt repayment, informing the team, documentation and the like. We can begin dealing with those. I intend to transition honorably and professionally.

(*Id.* (emphasis added).) Finally, in December 2015, Defendant sent Plaintiff an email discussing compensation and stating: "I, too, would have devoted less time had I known in advance that the economics of ***our partnership*** would never materialize." (Dkt. No. 115-2 at 8 (emphasis added).)

Based on the parties' repeated references to their "partnership" in the correspondence above, as well as Plaintiff's testimony that the parties agreed to the terms set forth in the draft March 10 partnership agreement, the record reflects a genuine dispute as to whether the parties indeed carried on as partners.

### 2. Breach

Under California law, "a partner owes to the partnership and the other partners . . . the duty of loyalty and the duty of care." Cal. Corp. Code § 16404(a). Plaintiff's complaint alleges that Defendant "breached his fiduciary duty [under the partnership] to act with good faith, due care and loyalty to Plaintiff." (Dkt. No. 1 at ¶ 17.) Defendant argues that summary judgment is warranted because even if a partnership existed, Plaintiff has produced no evidence showing that Defendant breached any fiduciary duty, or produced evidence giving rise to a genuine dispute of material fact on that score. Construing the record in the light most favorable to Plaintiff, the Court agrees.

### a. Duty of Loyalty

The duty of loyalty requires a partner:

> (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity.
>
> (2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership.
>
> (3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

Cal. Corp. Code § 16404(b)(1)-(3). Plaintiff's complaint alleges that Defendant "attempt[ed] to take assets of the jointly owned business and [usurped/compromised] business opportunities held by the partnership." (Dkt. No. 1-1 at ¶ 17.) Plaintiff's opposition further clarifies that Defendant breached the duty of loyalty by *asking* Plaintiff to reinstate Defendant's "direct security interest in [Plaintiff's intellectual property]." (Dkt. No. 119 at 23 (emphasis added).) Defendant insists that summary judgment is warranted because Plaintiff presents no evidence of any actual breach of loyalty, and instead, Defendant's request in 2016 to reinstate his direct security in Plaintiff's intellectual property as part of negotiations for a loan forbearance agreement was proper under California law. The Court agrees that Plaintiff presents no evidence giving rise to a genuine dispute of material fact as to whether Defendant's mere request to reinstate his security interest in Plaintiff's intellectual property breached the duty of loyalty. Further, any such request is permitted under California law.

"A partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest." Cal. Corp. Code § 16404(e). Further:

> A partner may lend money to and transact other business with the partnership, and as to each loan or transaction, the rights and obligations of the partner regarding performance or enforcement are the same as those of a person who is not a partner, subject to other applicable law.

Cal. Corp. Code § 16404(f). Thus, even if Plaintiff had agreed to Defendant's request, Defendant would not have breached the duty of loyalty by reinstating the security interest he previously held

17

1   in Plaintiff's intellectual property as forbearance for repayment of the promissory notes. It follows

2   that Defendant's mere request to do so as part of a loan forbearance negotiation does not constitute

3   a breach of loyalty under California law. Because Plaintiff's conclusory allegations are

4   insufficient to defeat summary judgment, and the evidence is insufficient to support a finding that

5   Defendant breached the duty of loyalty, Plaintiff's duty of loyalty theory fails as a matter of law.

6                              **b.    Duty of Care**

7          A partner's duty of care "is limited to refraining from engaging in grossly negligent or

8   reckless conduct, intentional misconduct, or a knowing violation of the law." Cal. Corp. Code §

9   16404(c). Plaintiff insists that Defendant breached his duty of care by failing to "use diligent

10  efforts to recruit executives and solicit investments in FairWay operating companies." (Dkt. No.

11  119-1 at ¶ 19.) Defendant argues that summary judgment is warranted because Plaintiff fails to

12  put forth any evidence that Defendant engaged in proscribed conduct giving rise to a breach of the

13  duty of care. The Court agrees. Defendant has met his initial burden of showing that Plaintiff

14  "does not have enough evidence of an essential element [of his breach of fiduciary claim] to carry

15  [his] ultimate burden of persuasion at trial," and Plaintiff has failed to produce "evidence to create

16  a genuine issue of material fact" on that score. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz

17  Cos.*, Inc., 210 F.3d 1099, 1103, 1106 (9th Cir. 2000).

18         Plaintiff argues that Defendant breached his fiduciary duty of care by failing to diligently

19  recruit executives and solicit investments for FairWay. (Dkt. No. 119-1 at ¶ 19.) Even taking

20  Plaintiff's allegation as true, Plaintiff cites no authority indicating that a lack of "diligence" rises

21  to the level of "grossly negligent or reckless conduct,[15] intentional misconduct, or a knowing

22  violation of the law" sufficient to show a breach of the duty of care under Section 16404. Further,

23  the only evidence Plaintiff points to in support of this claim does not give rise to a genuine issue of

24  material fact regarding any such conduct.

25  _____

26  [15] A plaintiff alleging gross negligence must prove that a defendant's actions constituted a
    complete lack of due care "or an extreme departure from the ordinary standard of conduct."

27  *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (Cal. Ct. App. 2011). For
    conduct to be considered reckless, it must generally "rise to the level of a conscious choice of a

28  course of action" despite knowledge of dangerous consequences. *Delaney v. Baker*, 20 Cal. 4th
    23, 31-32 (1999).

Plaintiff's opposition[16] states that Defendant's "lack of diligent activity to solicit investors, one of the two primary duties of Defendant Forman in the partnership[,] is demonstrated on the face of Exhibit S." (Dkt. No. 119 at 24.) Exhibit S includes the names and titles of individuals, the firms they worked for, and the year Defendant made "Direct and Indirect" introductions of those individuals to Plaintiff for purposes of obtaining funding for FairWay. (Dkt. No. 115-6 at 26-29.) The list indicates that between 2010 and 2015—the time period during which the partnership allegedly began and ended—Defendant made 111 such introductions. (*Id.*) The list also includes 28 "Additional Third Party Meetings and Interactions" Defendant participated in to solicit funding during that time. (*Id.* at 29-30.)

Plaintiff testified that the list indicates that Defendant made "a decent effort" during the "first nine months of the partnership," but after that, Defendant's "diligent efforts went down to less than one per month and then they fell down to four per year and then they fell down to two per year." (Dkt. No. 103-2, Ex. A at 30.) Plaintiff further testified, "I do not consider that diligent, and that is a breach." (*Id.*) However, "to avoid summary judgment, a non-movant must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (noting that "[a] non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment.") Here, there is nothing in Plaintiff's testimony nor the face of exhibit S from which a reasonable trier-of-fact could find that Defendant was grossly negligent or reckless, or engaged in intentional misconduct "or a knowing violation of the law." *See* Cal. Corp. Code § 16404.

Plaintiff's opposition cites no other evidence[17] in support of Defendant's alleged breach,

---

[16] Plaintiff's initial opposition to Defendant's motion for summary judgment on Plaintiff's complaint, (Dkt. No. 115), failed to comply with the page limit requirements under the Local Rules. Plaintiff then filed "an abbreviated" opposition, (Dkt. No. 119), but did not include all exhibits filed with the initial opposition. However, Plaintiff's declaration submitted with the abbreviated opposition references the same exhibits submitted with the initial opposition. (*See* Dkt. No. 119-1.) The Court thus relies on those exhibits when addressing the exhibits referenced in Plaintiff's abbreviated opposition, (Dkt. No. 119). Similarly, Plaintiff filed a revised opposition to Defendant's motion for summary judgment on Defendant's counterclaims, (Dkt. No. 118), that also references exhibits submitted with the initial opposition, (Dkt. No. 116).
[17] Plaintiff includes with his opposition his "Further Supplemental Response" to Defendant's

other than the aforementioned exhibit,[18] and the Court is not required to scour the voluminous record in this case searching for such evidence. *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (noting that on summary judgment, "Rule 56(e) requires that the adverse party's 'response,' not just the adverse party's various other papers, 'set forth specific facts' establishing a genuine issue."). Indeed, '[r]equiring the [Court] to search the entire record for a genuine issue of fact, even though [Plaintiff] does not set it out in the opposition papers" would be "profoundly unfair" to both the Court and Defendant. *See id.* (noting that "[t]he movant is . . . denied a fair opportunity to address the matter in the reply papers" where the court "searches the whole record" for a genuine issue of fact not raised by the nonmovant).

Drawing all reasonable inferences from the record in Plaintiff's favor, no reasonable trier of fact could find that Defendant engaged in "grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law"; thus, summary judgment is warranted.

\*\*\*

As no reasonable trier of fact could find that Defendant breached the duties of loyalty or due care, the Court grants Defendant's motion for summary judgment on Plaintiff's claim for breach of fiduciary duty. The Court need not address Defendant's arguments regarding lack of evidence of damages, although the Court agrees that Plaintiff's claim is also deficient in that regard.

//

---

Special Interrogatories, dated February 16, 2018, which provides a more detailed allegation regarding the alleged breach of fiduciary duty. (*See* Dkt. No. 119-3 at 4-5) ("Defendant Forman, as acting CEO of [FairWay] failed to act with utmost good faith in the failed negotiation of an Early Adopter Agreement with UFT Financial (Chicago). Forman failed to follow up and failed to act diligently which approach led to the eventual cessation of this crucial business opportunity.") However, Plaintiff's opposition brief does not address that allegation or otherwise point to anything in the record that supports it. Further, email correspondence between UFT and Plaintiff indicates that negotiations were ongoing in October 2016—over a year *after* Defendant resigned from FairWay. (*See* Dkt. No. 103-3, Ex. KK at 54-56, Ex. LL at 58-61, Ex. MM at 63-66, Ex. NN at 68-70.) In any event, Plaintiff's allegations, if true, do not amount to grossly negligent or reckless conduct.

[18] Plaintiff appears to attribute this lack of affirmative evidence to Defendant's "fail[ure] to deliver requested documents in response to Plaintiff's" discovery request, dated June 14, 2018. (Dkt. No. 119 at 20.) The parties' discovery disputes are well documented and the Court will not revisit them here, except to note that the Court denied Plaintiff's motion to compel discovery related to his June 14, 2018 request by order dated October 2, 2018. (*See* Dkt. No. 98.)

20

### B.    Declaratory Relief

Plaintiff's complaint seeks declaratory relief regarding "the parties' rights, duties and obligations to each other" stemming from the alleged partnership and the December 2011 MOU. (Dkt. No. 1-1 at ¶ 29.)  Defendant insists that summary judgment is warranted on this claim as to the alleged partnership because Defendant owed no fiduciary duties to Plaintiff.  As to the MOU, Defendant's counterclaim insists that he is entitled to "declaratory relief rescinding" the MOU "for failure of consideration."  (*See* Dkt. Nos. 99 at 14; 103 at 30.)

"The Declaratory Judgment Act does not grant litigants an absolute right to a legal determination."  *United States v. State of Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985).  A court's decision whether to grant declaratory relief is instead "a matter of discretion," and "the court may, after a full consideration on the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of the relief sought."  *Id.*  "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties."  *Id.* at 1357.

Here, although there is a genuine dispute of fact regarding the existence of a partnership, that dispute is not material to Plaintiff's breach of fiduciary claim in the absence of evidence in support of such a breach.  Thus, affording Plaintiff declaratory relief will serve no useful purpose in settling the claims at issue, nor will it "terminate the proceedings."  *See State of Washington*, 759 F.2d at 1357 ("Precise resolution, not general admonition, is the function of declaratory relief.").  Similarly, Plaintiff's request for declaratory relief regarding the MOU serves no useful purpose and will not terminate the proceedings regarding Plaintiff's claim for breach of fiduciary duty.  Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's cause of action for declaratory relief.

### C.    Accounting

Plaintiff's cause of action for an accounting alleges that "there was a contractual relationship between the [p]arties and a balance is due and owing between them in an amount which is disputed and which cannot be ascertained without an accounting."  (Dkt. No. 1-1 at ¶ 31.)

Defendant provides no substantive argument regarding this claim, but instead insists that summary judgment "results from [his motion] and the companion [motion for summary judgment on Defendant's counterclaims], because [Defendant's] motions resolve any issues of the amounts due and owing between the parties." (Dkt. No. 103 at 30) (citing *St. James Church of Christ Holiness v. Superior Court*, 135 Cal. App. 2d 352, 359 (Cal. Ct. App. 1955) (no accounting necessary where the amount is for a sum certain or "where it appears from the complaint that none is necessary or that there is an adequate remedy at law.").  Plaintiff offers no opposition to summary judgment regarding this claim, and even if he did, such opposition would be futile because his claim for an accounting is derivative of his breach of fiduciary duty claim.  *See Janis v. California State Lottery Comm'n*, 68 Cal. App. 4th 824, 833-34 (Cal. Ct. App. 1998) (holding that cause of action for an accounting must fail where underlying claims fail because "[a] right to an accounting is derivative; it must be based on other claims.").

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's claim for an accounting because it is derivative of his breach of fiduciary claim.

## II.    Cross Motions for Summary Judgment on Defendant's Counterclaims

The burdens faced by opposing parties on cross motions for summary judgment "vary with the burden of proof they will face at trial." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513 (N.D. Cal. 1995).  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted).  In that case, the moving party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.*  If the party produces sufficient evidence on that score, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Id.* (internal quotation marks and citation omitted).  If the opposing party "fails to produce enough evidence to create a genuine issue of material fact," the moving party wins the motion for summary judgment." *Fritz Co., Inc.*, 210 F.3d at 1103.  "[W]hen simultaneous cross-motions for summary judgment on the

same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). In other words, the Court will consider all evidence in the record, regardless of whether a party identified it in support of or in opposition to a motion.

Defendant moves for summary judgment on his counterclaims for: (1) breach of promissory notes and loan agreements; and (2) declaratory relief (rescission).[19] Defendant also seeks injunctive relief prohibiting Plaintiff from conveying his interest in any FairWay-related entity, the FairWay IP, and his general assets until Plaintiff "has satisfied in full the judgment entered against him" on these claims. (Dkt. No. 99 at 31-32.) Further, Defendant seeks "an award of reasonable attorney's fees and costs based on the attorney's fees provisions in the [notes]." (*Id.* at 32.)

Plaintiff likewise moves for summary judgment on Defendant's counterclaims, arguing that: (1) the notes at issue are usurious; and (2) Defendant failed to register as a licensed finance lender as required under the California Financial Code, § 22000 et seq. The Court addresses Defendant's counterclaims in turn.

### A.    Breach of Promissory Notes

To establish a breach of contract under California law, a claimant must show: "(1) the contract, (2) the [claimant's] performance or excuse for nonperformance, (3) [the opposing party's] breach, and (4) the resulting damages to [the claimant]." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 228 (Cal. Ct. App. 2014). Similarly, under Delaware law, the elements of a breach contract claim are: (1) "the existence of a contract"; (2) "the breach of an obligation imposed by that contract; and" (3) resulting damages to the claimant. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 389 (3d Cir. 2016) (internal quotation marks and citation omitted).

---

[19] Defendant does not move for summary judgment on his third counterclaim for equitable relief; instead, he asserts that the third counterclaim "becomes moot" if the Court grants Defendant's motion for summary judgment "against all claims asserted in Plaintiff's complaint." (Dkt. No. 99 at 6.) Having granted Defendant's motion, the Court agrees that the third counterclaim is moot.

The record shows that the parties entered into 33 loan agreements between 2006 and 2011 reflected in promissory notes that were payable by Plaintiff upon Defendant's demand. Plaintiff does not dispute the existence or facial validity of the notes at issue; indeed, Plaintiff includes them (and several other promissory notes between the parties) as exhibits to his cross motion for summary judgment. (*See* Dkt. No. 101-4, Ex. A at 2-177.) Further, the Loan Managers clearly reflect Plaintiff's express recognition that he is individually liable for payment of the notes on demand. Plaintiff's February 29, 2016 email to Defendant includes a Loan Manager with a summary entitled "Personal Loans – Forman to Avery" that lists "Accumulated Loans with interest" dating from August 2006 to October 2011. (Dkt. No. 99-4, Ex. 53 at 114.) The list includes the 33 notes at issue. The summary states, in pertinent part:

> All principle [sic] and interest is due and payable on demand by Nathaniel Caleb Avery
>
> Signed by Nathaniel Caleb Avery both individually
> and as Chairman and CEO of Urso Limited,
> on behalf of Urso, Ltd.
> 35 New Road
> Belize City, Belize
>
> ** Also includes $100K Convertible Debt Note with FairWay Pricing Technologies which Nathaniel Caleb Avery and Urso Ltd. will take personal and corporate responsibility to the extent that Note is not repaid by FairWay Pricing Technologies according to its terms.

(*Id.*) It is undisputed that Plaintiff failed to comply with Defendant's demand for payment in May 2017. Finally, Plaintiff's breach resulted in damages to Defendant reflected in the unpaid amounts owed under the notes.

Based on the record before the Court, Defendant has satisfied his burden of demonstrating the absence of a genuine dispute of material fact on the essential elements of his breach of contract claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)*; see also Atl. Mut. Ins. Co.*, 891 F. Supp. at 513 ("'Where the moving party has the burden of [proof at trial,] his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'") (quoting Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). Thus, the burden shifts to

Plaintiff to "present significant probative evidence tending to support its claim or defense." *See Darden Rests., Inc.*, 213 F.3d at 480. As discussed below, Plaintiff has not met that burden.

### 1. Statute of Limitations

Plaintiff argues that Defendant's breach of contract claim is barred by the applicable statute of limitations because "[t]he statute of limitations on Demand Notes begins to run when Demand Notes are signed, not upon their demand." (Dkt. No. 118 at 12.) Plaintiff cites no authority for this argument; however, he is correct that the statute of limitations begins to run upon execution of a demand note. There is a four-year statute of limitations under California law for breach of contract claims, *see* Cal. Civ. Proc. Code § 337, and "loans payable on demand are deemed payable at their inception, and the statute begins to run from such time," *Buffington v. Ohmert*, 253 Cal. App. 2d 254, 256 (Cal. Ct. App. 1967). Under Delaware law, the statute of limitations is six years. 10 Del. C. § 8109 ("When a cause of action arises from a promissory note, bill of exchange, or an acknowledgement under the hand of the party of a subsisting demand, the action may be commenced at any time within 6 years from the accruing of such cause of action.").

Defendant first filed his counterclaim for breach of contract on May 17, 2017. (Dkt. No. 29.) Thus, based solely on the date of the notes at issue, which were executed between 2006 and 2011, and the date of Defendant's first counterclaim, the statutes of limitations under California and Delaware law appear to bar his claim. However, the Loan Managers effectively restarted the statute of limitations under both California and Delaware law. *See e.g.*, Cal. Civ. Proc. Code § 360 ("No acknowledgement or promise is sufficient evidence of a new or continuing contract, by which to take the case out of the operation of [the statute of limitations], ***unless the same is contained in some writing, signed by the party to be charged thereby***, . . .") (emphasis added); *Mykulak v. Collins*, 301 A.2d 313, 316 (Del. Super. Ct. 1973) (interpreting Section 8109's precursor statute, 10 Del. C. § 8108, and holding that the statute provides "a six year limitation for bringing action on ***a written instrument which acknowledges an existing indebtedness***.") (emphasis added).

In his cover email for the December 2007 Loan Manager, Plaintiff notes that the Loan Managers were "valid & binding – signed under the Electronic Signature Act." (*See* Dkt. No. 99-

25

3, Ex. 38 at 56; *see also id.*, Ex. 39 at 61 ("[T]hese electronic docs are completely binding [signed under the Electronic Signatures Act].").) As previously discussed, beginning with the March 2008 Loan Manager, Plaintiff includes the following:

> All principle and interest is due and payable on demand by Nathaniel Caleb Avery
> To the extent any collateral is held by Urso Limited (also owned by Avery),
> that collateral is pledged as well [to the extent necessary to fully repay both principle and interest]
>
> Signed by Nathaniel Caleb Avery both individually
> and as Chairman and CEO of Urso Limited.
> on behalf of Urso, Ltd.
> Marina Towers, Suite 302,
> Newtown Barracks,
> Belize City, Belize
>
> N. Caleb Avery
> [signed under the Electronic Signatures Act of 2000 [Public Law No: 106-229]] and legally binding upon all his assignees and heirs

(Dkt. No. 99-3, Ex. 40 at 67.) Plaintiff then sent Defendant updated Loan Managers in April 2008, May 2008, August 2008, September 2008, October 2009, April 2010, February 2011, and October 2011. Each of the Loan Managers included Plaintiff's electronic signature and his acknowledgement of his obligation to pay the notes on Defendant's demand. The Loan Managers also included *all* of the notes at issue that are governed by California law. Such written acknowledgement is sufficient to renew the statute of limitations. *See Western Coal & Mining Co. v. Jones*, 27 Cal. 2d 819, 823 (1946) (noting that "[t]he distinct and unqualified admission of an existing debt contained in a writing signed by the party to be charged, and without intimation of an intent to refuse payment thereof, suffices to establish the debt to which the contract relates as a continuing contract, and to interrupt the running of the statute of limitations against same") (internal quotation marks and citations omitted).

The December 2011 Loan Manager adds an additional line to the above, stating:

> **Also includes $100K Convertible Debt Note with FairWay Pricing Technologies which Nathaniel Caleb Avery and Urso Ltd will take personal and corporate responsibility to the extent that Note is not repaid by FairWay Pricing Technologies according to its terms.

(Dkt. No. 99-4, Ex. 51 at 53.) The parties executed the FairWay Pricing Technologies note in April 2006, and it is governed by Delaware law, which provides for a six-year statute of limitations.[20] Plaintiff's acknowledgement of the FairWay Pricing Technologies note in the December 2011 Loan Manager and his representation that he would take "personal" responsibility for the note, was sufficient to restart the six-year statute of limitations under Delaware law. *See Mykulak*, 301 A.2d at 316 (holding that "an instrument which by its terms clearly recognizes or admits the existence of a prior claim or debt is sufficient" to commence the statute of limitations).

Plaintiff next sent Defendant Loan Managers in March 2015 and February 2016 that likewise reference all 33 of the notes at issue. (*See* Dkt. No. 99-4, Ex. 52 at 111, Ex. 53 at 114.) Thus, the Loan Managers indicate that Plaintiff renewed the applicable statutes of limitations prior to their expiration, and Defendant's breach of contract claim—first filed in May 2017—falls within the limitations period.

Plaintiff insists that "the intent underlying the Loan Managers was not to serve as an acknowledgement of the debt but rather in compliance with his obligation as a partner to provide information about the partnership." (Dkt. No. 118 at 12-13.) Plaintiff characterizes the question regarding his "intent" in drafting the Loan Managers as a "factual dispute" sufficient to defeat summary judgment. (*See id.*) Plaintiff is wrong.

To give rise to a genuine dispute of material fact, Plaintiff must provide *evidence*—not unsupported assertions. *See Liberty Lobby, Inc.*, 477 U.S. at 250 ("[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'") (quoting Fed. R. Civ. P. 56(e)); *see also Galen v. Cty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) ("Bald assertions that genuine issues of material fact exist are insufficient."). Here, not only does Plaintiff fail to provide any evidence in support of his "intent" argument, that argument is directly contradicted by the record. The Loan Managers show that Plaintiff contemporaneously characterized the notes at issue as "Personal Loans – Forman to Avery" and represented that he was individually responsible for payment of the notes

---

[20] The previous Loan Managers all reference the August 2006 note, which is also governed by Delaware law.

upon Defendant's demand.  The only reasonable inference to be drawn from the Loan Managers is that they acknowledged Plaintiff's debt to Defendant.

At oral argument Plaintiff insisted that the Loan Managers did not acknowledge Plaintiff's debt because the December 2011 MOU relinquished Plaintiff's obligation to pay the notes, or at least required Defendant to first seek payment from Urso before making demand upon Plaintiff. Putting aside that this argument is not really about the statute of limitations, it nonetheless fails because the MOU cannot reasonably be read to support Plaintiff's interpretation.  And Plaintiff points to no other evidence in the record to support his argument: no testimony as to conversations with Defendant, no emails or other correspondence, and no other documentary evidence that even hints that Defendant had agreed to give up his right to repayment from Plaintiff.  Instead, the record includes Loan Managers issued by Plaintiff subsequent to the MOU that expressly acknowledge his debt and make no mention of the debt being relinquished.  Simply put, no reasonable trier of fact could find the facts as urged by Plaintiff in this respect.

### 2.  Loans Intertwined with Partnership

Plaintiff further argues that summary judgment is inappropriate because there is "a factual dispute over the [existence] of the partnership that is intertwined with any status of the Demand Notes of 2006-2011."  (Dkt. No. 118 at 18.)  Again, however, Plaintiff points to no evidence in support of that assertion, and his argument is belied by the terms of the notes themselves—none of which mention a partnership—and the Loan Managers, which clearly show that Plaintiff understood that the notes at issue were personal loans from Defendant to Plaintiff.  Plaintiff's argument is also undercut by the timeframe of the loans—31 of the 33 notes at issue were executed *before* Defendant proposed terms of a partnership to Plaintiff in January 2010 and *before* Plaintiff responded to those proposed terms with the draft Preliminary Collaboration Agreement in March 2010.  The two loans that came after, in May 2011 and October 2011, contain identical terms and formatting (though different loan amounts) to the notes that preceded them in September 2006, November 2006, December 2006 (2), January 2007 (2), February 2007, March 2007 (3), April 2007, May 2007, June 2007, July 2007 (2), August 2007, September 2007, October 2007 (2), November 2007 (2), December 2007 (2), January 2008, February 2008, April

1   2008, and May 2008.  Again, none of the 33 notes at issue reference a partnership or any other

2   type of business relationship.

3        The December 2011 MOU from Plaintiff to Defendant detailing a restructured "payout

4   plan to [Defendant] that would retire the series of Promissory Notes dated from 2006-2011"

5   likewise does not contain any reference to the purported partnership.  (*See* Dkt. No. 99-4, Ex. 55 at

6   165.)  Further, to the extent that the Court recognizes a genuine dispute of fact as to the existence

7   of a partnership, that dispute is not material to the breach of contract counterclaim based on the

8   record before the Court.  *See Liberty Lobby, Inc.*, 477 U.S. at 248 ("Only disputes over facts that

9   might affect the outcome of the suit under the governing law will properly preclude the entry of

10  summary judgment.").

11       ### 3.  Failure to register under the California Financing Law and violation of
12       California Financial Code § 22750

13       Plaintiff moves for summary judgment and opposes Defendant's motion on the grounds

14  that the notes at issue are void because Defendant failed to register as a financial lender as

15  required under the California Financing Law ("CFL"), California Financial Code § 22000 et seq.

16  Plaintiff contends that by failing to register, Defendant violated California Financial Code §§

17  22750 and 22752(a) and thus Defendant is prohibited from collecting on the loans, or at least

18  collecting any interest on the loans.  Defendant counters that this argument fails because the notes

19  at issue are "commercial loans," and Sections 22750 and 22752(a) of the CFL apply only to

20  "consumer loans."  He further argues that Plaintiff has not shown that the CFL otherwise applies

21  to all of the loans at issue.

22       ### a.  Sections 22750 and 22752 Apply Only to Consumer Loans

23       The CFL provides that consumer loans "are subject to," among other chapters, "Article 2

24  (commencing with Section 22750) of Chapter 4."  Cal. Fin. Code § 22001(b).  Indeed, the title of

25  Article 2 of Chapter 4, where Section 22750 and 22752 are found, is "Consumer Loan Penalties."

26  Commercial loans, in contrast, are not covered by Article 2 of Chapter 4.  *See* Cal. Fin. Code §

27  22001(c) ("Commercial loans, as defined in Section 22502, are subject to this chapter, Chapter 3

28  (commencing with Section 22500), Article 1 (commencing with Section 22700) of Chapter 4, and

Article 3 (commencing with Section 22780) of Chapter 4."). Courts in this circuit have noticed this distinction in holding that Section 22750 does not apply to commercial loans. *See Central Valley Ranch, LLC v. World Wide Invs., LLC II*, No. 1:10-cv-00020 LJO DLB, 2012 WL 217685, at *5 (E.D. Cal. Jan. 24, 2012) (rejecting similar argument as "without merit" and noting that Section 22750 "relate[s] to consumer loans, not commercial loans such as those at issue here."); *WF Capital, Inc. v. Barkett*, No. C10-524 RSL, 2010 WL 3064413, at *5-6 (W.D. Wash. Aug. 2, 2010) (same); *In re Rose*, 266 B.R. 192 (Bankr. N.D. Cal. 2001) ((holding that "'commercial loans' as defined by § 22502" are not covered under § 22750.) Thus, Plaintiff's defense can succeed only if a reasonable trier of fact could find that the loans qualify as consumer loans.

### b. Whether the Loans Qualify as Consumer Loans

As defined by the CFL, a "consumer loan" is a loan "intended by the borrower for use primarily for personal, family, or household purposes." Cal. Fin. Code § 22203. Conversely, a "'[c]ommercial loan' means a loan of a principal amount of five thousand dollars ($5,000) or more . . . the proceeds of which are intended by the borrower for use primarily for other than personal, family, or household purposes." Cal. Fin. Code § 22502. Here, the notes at issue on Defendant's motion for summary judgment all have a principal amount of $5,000 or more. (*See* Dkt. No. 99-2, Exs. 1-33.) Thus, to defeat Defendant's motion, Plaintiff—who has the ultimate burden of proof on the CFL affirmative defense—must identify evidence sufficient to support a genuine dispute that the loans were not intended to be used primarily for *other than* personal, family or household purposes, that is, a finding that the loans were intended primarily for personal, family or household purposes.

Plaintiff's complaint alleges that the loans were commercial in nature: "Defendant, as part of his agreed upon support for the partnership/joint venture, provided funding for the partnership/joint venture which funds were characterized as Promissory Notes." (Dkt. No. 1-1 at ¶ 9.) This allegation is consistent with the terms of the first two promissory notes which themselves recite that the primary, or even exclusive, purpose of the loans was to fund FairWay. (*See* Dkt. No. 99-2, Ex. 1 at 12 ("Proceeds of Note (a) Use the proceeds of the Note for working capital, legal fees, and other [short-term] general corporate purposes."); Ex. 2 at 28 ("Proceeds of Note (a)

1  Use the proceeds of the Note exclusively for patent-related expenses (e.g., legal fees and the

2  related general costs) related to a contemplated international business.").  The parties subsequently

3  used a "Secured Promissory Note" form for the loans at issue on Defendant's motion (except the

4  loan to FairWay International Kft) that does not specify what the proceeds of the loans could be

5  used for.  (*See* Dkt. No. 99-2, Exs. 3-24; 26-33.)  However, based on the parties' past conduct,

6  which shows that Defendant made the loans to further a commercial purpose—the development of

7  FairWay—that omission does not give rise to a reasonable inference that the loans at issue were

8  consumer loans.  (*See* Dkt. No. 99-2, Exs. 3-24; 26-33.)

9          Plaintiff's cross motion for summary judgment and his opposition to Defendant's motion

10  fail to identify any evidence upon which a reasonable trier of fact could find that Plaintiff intended

11  to use the loans "primarily for personal, family, or household purposes."  *See* Cal. Fin. Code §

12  22203. (*See generally* Dkt. Nos. 101-13 & 118.)   Instead, Plaintiff's briefs ignored the

13  consumer/commercial distinction.  (Dkt. Nos. 101-13 at 7-8; 118 at 23-25.)  Plaintiff's reply in

14  support of his motion for summary judgment argues—for the first time—that the notes are not

15  commercial loans but are instead consumer loans "because proceeds from each and every Demand

16  Note were used for personal, family, or household purposes."  (Dkt. No. 120 at 8.)  Plaintiff's

17  declaration in support of his reply, (Dkt. No. 120-1), contains a similar assertion.  The Court,

18  however, "need not consider arguments raised for the first time in a reply brief."  *See Zamani v.*

19  *Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  And, even if the Court considers Plaintiff's reply

20  declaration, his conclusory statement lacks any facts and thus is insufficient to create a genuine

21  dispute of material fact.  *See Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1059 (9th Cir. 2005)

22  (noting the "longstanding precedent that conclusory declarations are insufficient to raise a question

23  of material fact"), *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570

24  U.S. 338 (2013).

25          At oral argument Plaintiff referred to deposition testimony from Defendant in which

26  Defendant acknowledged that some of the loans' proceeds were used by Plaintiff for his living

27  expenses.  Specifically, with regard to Defendant's percentage of "equity participation" in

28  FairWay companies, Defendant testified:

> [The equity] was tied to a single operating company[,] namely Fairway Financial US and I grew increasingly uncomfortable that I'd advanced a tremendous amount of money. That money was being used in part to going [sic] to provide [Plaintiff's] living expenses, housing, food, health needs, and the balance to develop and evolve[ ] his international patent portfolio and since these patents were international, and since it was anticipated that there were operating companies to be set up in jurisdictions around the world, I grew increasingly concerned about having all my eggs in one basket.

(*See* Dkt. No. 115-5 at 91 (211:16-212:2).) Plaintiff did not cite to this testimony in any of his pleadings in connection with the summary judgment motions; thus, the Court need not consider it. *See* Fed. R. Civ. P. 56(c)(3). However, because Plaintiff is unrepresented, and he seeks to have the testimony considered in defense to Defendant's counterclaims rather than on his affirmative claims, the Court will consider the late-identified deposition testimony. *See id.; see also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001) (noting that the trial court has discretion on summary judgment to consider materials in the record even if not cited to in the papers). Defendant, however, must be given an opportunity to respond, especially since Plaintiff did not claim that the loans qualify as consumer loans until his reply brief. Accordingly, Defendant may file a supplemental brief, not to exceed five pages, on whether, drawing all inferences in Plaintiff's favor, a reasonable trier of fact could find any of the loans at issue on Defendant's motion for summary judgment were made primarily for personal, family, or household purposes. The Court will take the issue under submission upon the filing of Defendant's supplemental brief. No further briefing or evidence is permitted.

### c. Whether the CFL Applies to the Loans

Defendant also insists that Plaintiff's CFL defense fails because Plaintiff was never a resident of California. Defendant's sole legal authority, however, is a decision of the Commissioner of the California Department of Corporations that states on its face that the decision "is applicable to the specific factual decision identified in the request for ruling, *and may not be relied upon in connection with any other factual situation.*" California Department of Corporations, *Howard, Rice, Nemerovski, Canady, Falk & Rabkin*, 1997 WL 157375 (April 2, 1997) (emphasis added). Thus, Defendant has not shown that the CFL does not apply to the loans due to Plaintiff's residency. Further, there is a genuine dispute as to whether Plaintiff resided in

California prior to September 2008.

### d. Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment on his CFL affirmative defense is DENIED. Drawing all inferences in Defendant's favor, Plaintiff has not shown that every reasonable trier of fact would have to find that Plaintiff intended the loans to be used primarily for personal, family, or household purposes.

While Defendant's breach of contract counterclaim includes loans for less than $5000, Plaintiff has also not established that if the $5000 threshold for a commercial loan is not met that means the loan is considered a consumer loan for purposes of the CFL penalty provisions even if the loan is *not* made primarily for personal, family, or household purposes. *See* Cal. Fin. Code § 22502. Accordingly, the Court denies Plaintiff's motion for summary judgment on his CFL affirmative defense as to the loans for less than $5000.

### 4. Usurious Loans

Plaintiff's cross motion for summary judgment on Defendant's counterclaims asserts a usury defense, arguing that Defendant is barred under California law from collecting interest on the notes at issue.[21] Such a defense, if successful, does not preclude Plaintiff's liability for the principal on the notes. *See In re Dominelli*, 820 F.2d 313, 318 n.3 (9th Cir. 1987) ("Under California law, if a transaction is usurious, generally the interest provision of the loan is void, but the principal of the loan is unaffected.") (citing *Rochester Capital Leasing Corp. v. K & L Litho Corp.*, 13 Cal. App. 3d 697, 831 (Cal. Ct. App. 1970) ("While the principal of a usurious transaction is recoverable, no interest whatsoever can be claimed by the usurious lender.")). To the extent Plaintiff moves for summary judgment based on the affirmative defense of usury, his motion fails because Plaintiff does not establish "beyond controversy every essential element" of usury. *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting the movant's burden regarding issues on which they bear the burden of persuasion at trial).

---

[21] Plaintiff does not argue that the two loans governed by Delaware law are usurious.

1   Further, the evidence does not raise a genuine dispute of material fact as to whether the loans were

2   usurious and thus does not defeat Defendant's motion for summary judgment.

3       Under California law, "[n]o person, association, copartnership or corporation shall by

4   charging any fee bonus, commission, discount or other compensation receive from a borrower

5   more than the interest authorized by this section upon any loan or forbearance of any money,

6   goods or things in action.".  Cal. Const. Article XV, § 1(2).  The interest rate on the type of loans

7   at issue may not exceed 10% per year.  *Id.*  "The essential elements of usury are: (1) The

8   transaction must be a loan or forbearance; (2) the interest paid must exceed the statutory

9   maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the

10  lender must have a willful intent to enter into a usurious transaction."  *Ghirardo v. Antonioli*, 8

11  Cal. 4th 791, 798 (1994).  "A transaction is rebuttably presumed not to be usurious," and "[t]he

12  borrower bears the burden of proving the essential elements of a usurious transaction."  *Id.* at 798-

13  99.

14      There is no dispute as to the first and third elements—the notes at issue are loans, and the

15  loan and interest are repayable by Plaintiff.  Plaintiff also does not dispute that the notes governed

16  by California law bear interest at the legal limit of 10% per year.  Plaintiff attests, however, that

17  the loans exceed the statutory maximum interest rate because the parties agreed to "Equity

18  Override Agreements" in September 2006, February 2011, and June 2011 that provided Defendant

19  additional compensation in the form of the right to purchase as much as 2% equity in FairWay

20  operating companies.  (Dkt. No. 101-12 at ¶¶ 6-7.)  Plaintiff argues that these equity rights were

21  tied to Defendant's loans and thus constitute an impermissible "bonus" on top of the legal limit of

22  10% interest on the face of the notes.  As to the element of intent, Plaintiff provides no argument

23  in his motion, (see Dkt. No. 101-13 at 5-6), and asserts in his reply that "[t]he only time intent is

24  relevant is if the transaction does not appear on its face to be usurious," which "is not needed here

25  because the face of the note[s]" indicate they are usurious, (*see* Dkt. No. 120 at 15 (citing

26  *Ghirardo*, 8 Cal. 4th at 798)).

27      Defendant counters that that Plaintiff's usury defense fails because: (1) Plaintiff "has

28  presented no evidence that the interest paid on the loans exceeds the statutory maximum or that

Avery's offers to Forman had any demonstrable value"; (2) Plaintiff "has presented no evidence that his offers to Forman were made with the intent of the parties to evade the usury laws"; and (3) the "defense is barred by the doctrines of estoppel, in pari delicto, unclean hands, laches and/or waiver. (Dkt. No. 117 at 10, 17.) The Court finds Defendant's first and second arguments dispositive and agrees that the record is insufficient to grant summary judgment in Plaintiff's favor on his usury defense because Plaintiff fails to (1) provide sufficient evidence that the equity rights had demonstrable value at the time the loans were made and (2) demonstrate the requisite intent. For the same reasons, Plaintiff's evidence is insufficient to raise a genuine dispute of material fact as to whether the equity rights constituted impermissible compensation for the loans in addition to the 10% interest rate.

Under California law additional compensation received by the lender must be considered as interest in determining whether a loan is usurious. *See Bayne v. Jolley*, 227 Cal. App. 2d 630, 633 (Cal. Ct. App. 1964) ("The extraction of an additional payment in the form of a commission from which the lender will benefit, either directly or indirectly, is in effect a charge of an additional interest and will render usurious a loan made at the maximum interest rate [of 10%]."). However, any such "bonus" must have demonstrable value at the time of the loan. *Sandell v. Bailey*, 212 Cal. App. 2d 920, 934 (Cal. Ct. App. 1963).

Plaintiff asserts that Defendant's deposition testimony supports Plaintiff's assertion that the equity rights were related to the loans and acted as additional compensation. Defendant's testimony references a conversation wherein the parties discussed "how much equity [Defendant] was receiving by virtue of sustaining loans to [Plaintiff]." (Dkt. No. 101-6, Ex. C at 3.)

> Q: [The conversation] was something to the effect of Mr. t'Bear saying you were already getting equity as part of the loans?
>
> A: I wouldn't say that. What I would say is yes, I was purchasing equity at a very low price at a co-founder's price in Fairway Financial US. *But you know, that equity right was extended to me early on in the initial loans that I made Mr. t'Bear. . . . So I looked at the equity I was receiving as an enticement to make the early loans* and while the loans had multiplied in aggregate amount, the equity had not changed and I was becoming concerned with that.

(*Id.* at 3:7-23 (emphasis added).) Defendant testified that at one time "the only equity [he] owned

was in a single [FairWay] operating company," and he "grew increasingly concerned about having

all my eggs in one basket." (*Id.* at 4:1-4.) Further:

> Q: At some point, was there an agreement to extend this, I've seen
> the term equity kicker to all [FairWay operating companies]?
>
> A: Yes.

(*Id.* at 4:11-14.) The February 2011 letter sent by Plaintiff to Defendant, which Plaintiff

characterizes as an "Equity Override Agreement," states, in pertinent part:

> I would like to update my September 10, 2006 letter with regards to
> your initial founding position on any Operating Company being
> created by The FairWay Group (and Urso Ltd. in particular). First I
> would like to thank you for your ongoing support for, and counsel to
> all aspects of the FairWay Group. In recognition of this, I would like
> to amend the previous standing offer of 0.5% (1/2 of 1 percent) of
> any company founded related to the manufacture and
> implementation of the FairWay Marketplace Platform. Let's triple
> that to 1.5% (1.5 percent) of <u>any and all</u> companies founded within
> The FairWay Group of companies—this includes FairWay
> International and <u>any and all</u> FairWay Operating Companies. As
> before there are no strings attached to this offer and it is separate and
> above any offers for your participation for an advisory, oversight, or
> operating partner role.

(Dkt. 101-7, Ex. D at 2.) The June 2011 "Equity Override Agreement" increased the offer to 2%.

(*Id.* at 4.) In response to questioning regarding the February 2011 letter, Defendant testified: "I

don't know that I formally agreed [to its terms]." (Dkt. No. 101-6, Ex. C at 6:23.) Defendant

continued, however:

> *If I was offered additional equity, which I believe I deserved and
> I'm sure that this was offered to me in some measure because I'm
> probably looking for it whenever I felt uncomfortable that I was
> not being adequately rewarded for the loans that I was advancing*,
> I would allude to that from time to time and I think this is a response
> to [Plaintiff] appreciating my concern.

(Dkt. No. 116-5, Ex. O at 92 (emphasis added).)

Further, Defendant testified:

> So I don't remember specifically what I thought about reading this. *I
> read this letter to mean that [Plaintiff] was finally bumping the
> equity related to the debts he owed to me, because he knew that I
> was uncomfortable with what I was receiving*. And he was showing
> me how he was calculating it. And I took it that far.

(Dkt. No. 101-6, Ex. C at 7:11-17 (emphasis added).) Defendant also testified:

> *[T]he amount of equity I was getting related to the loans I'd extended to him* did not move unless he made it move, but nevertheless, he was soliciting money from me again and again and again. . . . And yet the participation in one or more companies did not scale with those debts and I became uncomfortable from time to time and he knew that and this, *my understanding of this is that it was an adjustment to make me feel perhaps better about it and continue to lend him money.*

(Dkt. No. 116-5, Ex. O at 93 (emphasis added).)  Further, the January 2016 draft letter memorializing Defendant's exit from FairWay includes terms stating that Defendant would "continue in a more limited advisory role and *receive compensation for past advisory services and loans to the FairWay Group*."  (Dkt. No. 103-2, Ex. R at 233 (emphasis added).)  Thus, the record supports an inference that Plaintiff's offers of equity rights in FairWay companies were related to Defendant's loans.  The record fails to support a finding, however, that such offers constitute a "bonus" sufficient to render the loans usurious because there is no evidence that the equity rights had demonstrable value at the time the loans were made.

In opposition to Plaintiff's cross motion for summary judgment and his usury defense, Defendant submits the September 2006 letter as evidence that the equity rights were valueless.  (*See* Dkt. No. 117-3, Ex. B at 2-3.)  Defendant asserts that the September 2006 letter "merely offers [Defendant] the right to purchase, for a small price, a percentage of shares in non-existent FairWay entities that might never be formed."  (Dkt. No. 117 at 12.)  Defendant also submits the declaration of Greg Regan, "an experienced valuation expert," who reviewed "the materials [Plaintiff] submitted to the Court" and "concluded that [Plaintiff] has not provided any information upon which one could determine the value of rights offered to [Defendant] in the September 10, 2006 letter."  (*See* Dkt. No. 117-6 at ¶¶ 2, 6.)  Further, Mr. Regan opines: "The information cited by [Plaintiff] does not provide a basis under acceptable and widely-used valuation methods to determine the value of the rights offered in the February 4, 2011 and June 5, 2011 letters, as of those dates (or any dates)."  (*Id.* at ¶ 8.)

Plaintiff offers no evidence to rebut Mr. Regan's declaration, and instead merely argues that Mr. Regan's declaration and methodology is faulty.  (*See* Dkt. No. 120 at 12-13.)  Such assertions do not give rise to a genuine dispute of material fact; Plaintiff must instead identify

evidence to rebut Defendant's evidence. *See Galen*, 477 F.3d at 658 ("Bald assertions that genuine issues of material fact exist are insufficient."). Plaintiff further argues that the equity rights had value because Defendant perceived value in them and "had complete knowledge of the opportunity and equity value" as a "full partner" in FairWay. (*See* Dkt. No. 120 at 13-14.) Defendant's perceived value is not enough, however, given that any additional bonus or compensation for the loans must have *demonstrable value at the time the loans are made*. *See Bailey*, 212 Cal. App. 2d 920, 935 (noting that for usury purposes, "[t]he value of the stock after the date the option was given is immaterial even though it may later become valuable," and "[t]he lender is charged with the value of property at the time he receives it regardless of what is later received from the sale of it."). Thus, to raise a genuine dispute of material fact, Plaintiff must identify evidence that would support a reasonable inference that the equity rights had some value at the time of the loans. Plaintiff fails to do so.

In the absence of any evidence that the equity rights had demonstrable value at the time of the loans, Plaintiff's motion for summary judgment fails because he has not proved the second element of usury—that the interest on the loans in question exceeded the statutory maximum. *See Darden Rests., Inc.*, 213 F.3d at 480 ("When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitled it to a directed verdict if the evidence went uncontroverted at trial.") (internal quotation marks and citation omitted). Plaintiff's lack of evidence means his usury affirmative defense to Defendant's motion for summary judgment also fails. It follows that Plaintiff's argument regarding the element of intent also fails because there is no evidence that the loans were usurious on their face.

\*\*\*

The Court denies Plaintiff's cross motion for summary judgment on Defendant's counterclaims because Plaintiff fails to establish as a matter of undisputed fact that the loans were usurious or barred by the CFL. The Court defers ruling on Defendant's motion for summary judgment on his breach of contract counterclaim pending his submission of a supplemental brief regarding the loans not qualifying as consumer loans as a matter of law.

**B.     Declaratory Relief**

38

Defendant's motion also seeks declaratory relief; specifically, rescission of the December 2011 MOU for failure of consideration. Defendant argues that rescission is warranted because Plaintiff's promised consideration has failed in two ways: (1) Plaintiff failed to repay Defendant's loans by the end of 2012; and (2) Plaintiff no longer holds a 100% ownership interest in Urso, which he pledged in the MOU as the "main collateral" for the notes at issue. (Dkt. No. 99 at 23-25.) Defendant further insists that rescission is necessary to restore his security interest in the FairWay IP because Plaintiff is otherwise "judgment proof" and cannot satisfy any monetary award ordered by this Court.

Defendant's declaratory relief claim is in effect a claim that Plaintiff breached the MOU. Thus, to prevail, Defendant must establish that drawing all reasonable inferences in Plaintiff's favor, every reasonable factfinder would have to find that Plaintiff breached the MOU. Then, based on that breach, Defendant seeks a declaration that the MOU is rescinded and thus his loans are again secured directly by the Fairway IP. As previously noted, a court's decision whether to grant declaratory relief is "a matter of discretion," and "the court may, after a full consideration on the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of the relief sought." *State of Washington*, 759 F.2d at 1356.

The Court is not comfortable ordering the relief sought based on the record before it for two reasons. First, Defendant's motion relies heavily on Plaintiff's failure answer the declaratory relief counterclaim. (Dkt. No. 99 at 23.) However, Plaintiff did answer the counterclaim, just not in a timely manner. (*See* Dkt. No. 112.) Defendant offers no legal authority for the proposition that an untimely answer, filed before the defendant is held in default, admits the well-pleaded allegations of the complaint. Second, Defendant has not addressed why Urso—the purported 100% owner of the Fairway IP—does not need to be made a party to these proceedings if what Defendant seeks is a declaration that Defendant has a priority lien to the Fairway IP—an asset held by Urso.

The Court in its discretion therefore denies Defendant's motion for summary judgment on its declaratory judgment claim without prejudice to renewal.

39

### C. Injunctive Relief

Defendant insists that injunctive relief is necessary to ensure Plaintiff's satisfaction of any monetary judgment against him. At the outset, however, strictly monetary harm "will not usually support injunctive relief." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009); *see also Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."). Further, the Court is not satisfied on the record before it that Plaintiff is unable to satisfy any judgment against him.

### III. Defendant's Motion for Sanctions

Defendant moves for sanctions against Plaintiff pursuant to Federal Rules of Civil Procedure 37(b) and 41(b) because: (1) Plaintiff "violated the Court's May 17 and June 6 Orders by failing to complete his document production by June 21"; (2) Plaintiff "violated the Court's July 18 Order concerning production of assertedly privileged documents"; (3) Plaintiff "walked out of his Court-ordered deposition before questioning was completed"; (4) Plaintiff "has ignored the Court's August 6 Order to pay monetary sanctions to [Defendant]"; and (5) Plaintiff "improperly interfered with document production and testimony from Timothy Covington." (Dkt. No. 111 at 2.) Defendant requests that the Court grant his motion and dismiss Plaintiff's complaint with prejudice, "impose a sanction prohibiting [Plaintiff] from opposing [Defendant's] second counterclaim [seeking rescission of the December 2011 MOU]." (*Id.* at 22.) Plaintiff has not opposed or otherwise responded to Defendant's motion.

The Court has granted Defendant's motion for summary judgment on Plaintiff's complaint; thus, terminating sanctions are not necessary. It is always preferable to decide a case on its merits. While Defendant also seeks an order that Plaintiff cannot oppose Defendant's claim for declaratory relief, most of the misconduct is not tethered to that counterclaim, which was not even added to this lawsuit until July 2018. Defendant does contend that Plaintiff testified at his deposition in July 2018 that he is withholding documents created after October 2016, including documents relevant to the ownership of Urso. Defendant, however, never moved to compel such testimony or documents. He cites no legal authority that would allow what is in effect a default

judgment for failing to produce evidence absent a court order.

On August 6, 2018, the Court did order Plaintiff to pay $3360 in sanctions for discovery violations as of May 2018. (Dkt. No. 86.) According to Defendant, Plaintiff has yet to pay those sanctions despite four separate inquiries from Defendant's counsel. (Dkt. No. 111 at 14.) Plaintiff shall pay the monetary sanction, as previously ordered, on or before February 21, 2019 and shall file a written submission with the Court by the same date confirming that he has complied with the Court's order and paid the sanction.

## IV. Plaintiff's Motion for Leave to Amend

On October 15, 2018, after submitting his motion for summary judgment on Defendant's counterclaims, Plaintiff filed an answer to Defendant's second amended counterclaim asserting 16 affirmative defenses.

On January 7, 2019, Plaintiff purportedly moved under Federal Rule of Civil Procedure 36 to "allow motion for leave to amend filing of amended affirmative defenses by Plaintiff." (Dkt. No. 134.) Specifically, Plaintiff states that he "move[s] under Rules [sic] 36, to amend its responses to the Defendant's Motion for Summary Judgment to Defendant's Counterclaims filed October 4, 2018." (*Id.* at 2.) Plaintiff asserts that "[t]he Motion is ready to file," and "[t]he Court has only to allow." (*Id.*) Plaintiff clarified at oral argument that he is seeking leave to amend based on "additional claims" brought by Defendant in his motion for summary judgment on his counterclaims. Notwithstanding that Plaintiff's motion fails to comply with the requirements of Civil Local Rule 7-2, the motion is moot. As the Court explained to Plaintiff at oral argument, it is only adjudicating the counterclaims asserted in Defendant's July 19, 2018 second amended counterclaim, (*see* Dkt. No. 84). Plaintiff indicated that he understood. And, in any event, his motion is untimely. The time for Plaintiff to raise any issues in opposition to Defendant's motions for summary judgment was in his opposition briefing. (*See* Dkt. Nos. 113, 114.)

Accordingly, the Court denies Plaintiff's motion for leave to amend.

## CONCLUSION

The Court grants summary judgment in favor of Defendant on Plaintiff's claims for breach of fiduciary duty, declaratory relief, and an accounting, that is, on Plaintiff's entire complaint.

1    The Court denies Plaintiff's motion for summary judgment on Defendant's counterclaims

2    and denies without prejudice Defendant's motion for summary judgment on his declaratory

3    judgment claim.

4    The Court defers ruling on Defendant's motion for partial summary judgment on his

5    breach of contract counterclaim pending his submission of a supplemental brief regarding the

6    loans not qualifying as consumer loans as a matter of law.   Defendant's brief shall be submitted

7    on or before February 21, 2019.

8    The Court refers the parties to a randomly assigned magistrate judge for a settlement

9    conference to occur as soon as is convenient to the magistrate judge.

10   This Order disposes of Docket Nos. 101, 103, 111, and 134.

11   **IT IS SO ORDERED.**

12   Dated:  February 6, 2019

13

14   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28