UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>CALEB AVERY T'BEAR,<br><br>          Plaintiff,<br><br>   v.<br><br>BARRY FORMAN,<br><br>          Defendant.</td><td>Case No. 17-cv-00796-JSC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**</td></tr>
</table>

Barry Forman sues Caleb Avery t'Bear under the Declaratory Judgment Act, seeking rescission of an agreement between the parties that amended the terms of collateral for a series of loans Mr. Forman made to Mr. t'Bear.[1] (Dkt. No. 84.)[2] Mr. Forman alleges that rescission is warranted for failure of consideration. The Court held a bench trial in August 2019 and the parties filed their closing arguments in October 2019. This Opinion constitutes the Court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

**PROCEDURAL HISTORY**

On January 17, 2017, Mr. t'Bear sued Mr. Forman in California state court for breach of fiduciary duty, declaratory relief, and an accounting arising out of a failed business venture. (Dkt. No. 1-1.) Mr. Forman timely removed the action to this Court pursuant to 28 U.S.C. § 1441(b), based on diversity jurisdiction under 28 U.S.C. § 1332. (Dkt. No. 1 at ¶ 4.) Mr. Forman then brought counterclaims for breach of promissory notes and loan agreements. (Dkt. No. 29.) Mr. Forman filed his first amended counterclaim in June 2017, again asserting breach of promissory

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 4 & 8.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    notes and loan agreements.  (*See* Dkt. No. 36.)  In June 2018, Mr. Forman filed an unopposed

2    motion to amend his answer and counterclaim, (Dkt. No. 80), which the Court granted, (Dkt. No.

3    83).  On July 19, 2018, Mr. Forman filed an amended answer and second amended counterclaims

4    for breach of promissory notes and loan agreements, rescission, and in the alternative, "equitable

5    relief – enforcement of partnership rights."  (Dkt. Nos. 84.)

6          In October 2018, the parties filed cross-motions for summary judgment on Mr. Forman's

7    counterclaims, (Dkt. Nos. 99 & 101), and Mr. Forman moved for summary judgment on Mr.

8    t'Bear's underlying complaint, (Dkt. No. 103).  Mr. Forman also filed a motion for sanctions,

9    (Dkt. No. 111), and Mr. t'Bear filed a motion for leave to file "amended affirmative defenses,"

10   (Dkt. No. 134).  On February 6, 2019, the Court granted Mr. Forman's motion for summary

11   judgment on Mr. t'Bear's complaint, denied in part and deferred in part pending supplemental

12   briefing Mr. Forman's motion for summary judgment on his counterclaims, denied Mr. t'Bear's

13   cross motion for summary judgment on Mr. Forman's counterclaims, denied Mr. Forman's motion

14   for sanctions, and denied Mr. t'Bear's motion for leave to amend.  (Dkt. No. 142.)  In pertinent

15   part, the Court's Order denied Mr. Forman's motion for summary judgment on his counterclaim

16   for rescission of a December 2011 "Memorandum of Understanding" ("MOU") that is the subject

17   of this Order.  (*See id.* at 39.)  Mr. Forman then filed supplemental briefing on his breach of

18   contract counterclaim as ordered by the Court, and the Court granted Mr. Forman's motion for

19   summary judgment on that counterclaim, leaving only Mr. Forman's counterclaim for rescission.

20   (*See* Dkt. No. 148.)

21         The Court held a bench trial on that counterclaim on August 20-21, 2019, and the parties

22   filed their closing arguments thereafter.  (*See* Dkt. Nos. 226 & 227.)

23                          **PRELIMINARY ISSUES**

24         Prior to trial, Mr. t'Bear filed a motion to dismiss for failure to join indispensable parties,

25   pursuant to Federal Rule of Civil Procedure 19.  (Dkt. No. 188.)  After the trial, Mr. t'Bear filed a

26   "motion to conform to proof and to revise summary judgment orders," pursuant to Rules 15(b)(2)

27   and 54(b).  (Dkt. No. 228.)  Mr. Forman opposes both motions.  (*See* Dkt. Nos. 205 & 234.)  The

28   Court addresses each motion in turn.

## I.      Motion to Dismiss for Failure to Join Indispensable Parties[3]

The gravamen of Mr. t'Bear's Rule 19 motion to dismiss for failure to join indispensable parties is that "Urso, Ltd., FairWay IP Holdings, Ltd.[,] and more than 160 senior secured collateral debt investors[4] are both necessary and indispensable parties to [Mr. Forman's]" counterclaim.  (Dkt. No. 188 at 1-2.)  Mr. t'Bear further argues that the case must be dismissed because adding the other lenders will destroy diversity jurisdiction.  (*See id.* at 32-34, *see also* 188-1 at ¶ 18 (attesting that approximately 80 of the investors are domiciled in Washington state, where Mr. Forman resides).)

Federal Rule of Civil Rule 19 requires that a missing party be both necessary and indispensable to the action to grant a motion to dismiss for failure to join.  *See First Nat. Ins. Co. of Am. v. Peralta Cmty. Coll. Dist.*, No. 12-cv-5943 JSC, 2013 WL 622944, at *3 (N.D. Cal. Feb. 15, 2013).  To determine whether dismissal under Rule 19 is appropriate, a court engages in "three successive inquiries."  *E.E.O.C. v. Peabody W. Coal. Co.*, 400 F.3d 774, 779 (9th Cir. 2005).  "First, the court must determine whether a nonparty should be joined under Rule 19(a)."  *Id.*  If this question is answered in the affirmative, "the second stage is for the court to determine whether it is feasible to order that the absentee be joined."  *Id.*  If joinder is not feasible, the third step requires the court to determine "whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed."  *Id.*  In assessing necessity and indispensability, the inquiry should be both fact-specific and practical.  *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968).

The first prong of Rule 19(a)(1)'s necessary party test provides that a party must be joined if "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).  Thus, the Court must determine whether complete relief may be accorded only among *current* parties to the action.  *Disabled Rights Action Comm. v. Las Vegas Events,*

---

[3] The Court denied Mr. t'Bear's Rule 19 motion at the pretrial conference on August 1, 2019 and advised the parties that it would address the motion in this order.  (Dkt. No. 212 at 20:3-6.)

[4] Mr. t'Bear's declaration in support of the motion attests that "[t]he 160 senior secured collateral debt investors in FairWay's intellectual property were provided with first (i.e., collectively first) senior position collateral rights made available since [Mr. Forman] gave up his collateral rights in the FairWay intellectual property."  (Dkt. No. 188-1 at ¶ 12.)

United States District Court
Northern District of California

*Inc.*, 375 F.3d 861, 879 (9th Cir. 2004); *see also NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1068 (N.D. Cal. 2005) ("A Rule 19(a)(1) inquiry is limited to whether the district court can grant complete relief to the persons already parties to the action. The effect a decision may have on an absent party is not material.") (internal quotation marks and citation omitted).

Here, there is no dispute that the MOU is between Mr. Forman and Mr. t'Bear. (*See* Dkt. No. 99-4, Ex. 55 at 164-65.) In the three years since this litigation commenced, no other party has "claim[ed] an interest relating to the subject of the action." *See* Fed. R. Civ. P. 19(a)(1)(B). Further, Urso and FairWay IP Holding's interests are adequately represented by Mr. t'Bear. *See Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999) (noting that "an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit."). As for the "160 senior secured collateral debt investors," at the August 2019 pretrial conference Mr. Forman reiterated that he is not seeking a priority lien through his counterclaim for rescission but is instead seeking only to restore his direct security interest in the FairWay IP. (*Id.* at 18:1-7.) Thus, while the Court's judgment in this case may have an effect on those other investors in subsequent, *potential* litigation between themselves and Mr. t'Bear, any such effect "is not material" to the Rule 19(a)(1) inquiry because the Court can accord "complete relief to the persons already parties to the action"—Mr. Forman and Mr. t'Bear. *See NGV Gaming, Ltd.*, 355 F. Supp. 2d at 1068.

Because Mr. t'Bear fails to demonstrate that Urso, FairWay IP Holdings, or the 160 lenders are *necessary* parties in this action under Rule 19(a), the Court need not determine whether they are indispensable under Rule 19(b). *See Peabody W. Coal. Co.*, 400 F.3d at 779 (noting that dismissal under Rule 19(b) is a three-step inquiry and courts must first determine whether a nonparty is necessary under Rule 19(a)). Accordingly, the Court denies Mr. t'Bear's Rule 19 motion to dismiss.

## II.     Motion to Conform to Proof and to Revise Summary Judgment Orders

Pursuant to Rule 54(b), a court order that does not terminate the action "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and

liabilities."  Fed. R. Civ. P. 54(b); *see also City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.") (internal quotation marks and citation omitted).  District courts in this circuit typically consider "motions for reconsideration under Rule 54(b) in light of the standards for reconsideration under Rules 59(e) and 60(b)."  *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, No. C 09-4432 CW, 2015 WL 1849105, at *3 (N.D. Cal. Apr. 22, 2015) (citing *Awala v. Roberts*, No. C 07-0179 JSW (PR), 2007 WL 1655823, at *1 (N.D. Cal. June 6, 2007)).  "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Mr. t'Bear's motion seeks "leave to conform to proof pursuant to Federal Rule of Civil Procedure 15(b)(2) so this pled defenses in his answer may be determined by a jury," and for an order pursuant to Rule 54(b) "revis[ing]" the Court's February 2019 orders granting summary judgment in Defendant's favor on his breach of contract counterclaim, "so as to set that cause of action for a jury trial."  (Dkt. No. 228 at 2 (citing Dkt. Nos. 142 & 148).)  Mr. t'Bear asserts that such revision is necessary because the evidence adduced at trial gives rise to a "material dispute" over how the loans were to be repaid and "a jury is required to resolve this dispute."  (*Id.* at 17.)  Mr. Forman opposes the motion on the grounds that it is procedurally improper and fails to "demonstrate any basis for a request that the Court reconsider or vacate its summary judgment orders."  (Dkt. No. 234 at 2.)  The Court agrees on both scores.

First, the motion fails to comply with Civil Local Rule 7-9(a), which provides:

> (a) Leave of Court Requirement.  Before the entry of a judgment adjudicating all of the claims and the rights and liabilities of all the parties in a case, any party may make a motion before a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any interlocutory order on any ground set forth in Civil L.R. 7-9(b).  ***No party may notice a motion for reconsideration without first obtaining leave of Court to file the motion.***

Civ. L.R. 7-9(a) (emphasis added).  The Court previously advised Mr. t'Bear that motions for

reconsideration must "comply with the rules." (*See* Dkt. No. 82 at 15:11-15.)  Despite that

warning, and Mr. t'Bear's representation by "co-counsel" since August 1, 2019, (*see* Dkt. No.

209), Mr. t'Bear failed to first obtain the Court's permission to file the instant motion.  Indeed,

Mr. t'Bear's motion fails to address, much less cite, Local Rule 7-9.  (*See generally* Dkt. No. 228.)

Even construing Plaintiff's motion as properly seeking leave to file, it fails to satisfy the

Local Rules.  Under Civil Local Rule 7-9(b), a party seeking leave to file a motion for

reconsideration must show one of the following: (1) "a material difference in fact or law exists

from that which was presented to the Court before entry of the interlocutory order for which

reconsideration is sought" and "that in the exercise of reasonable diligence the party . . . did not

know such fact or law at the time of the interlocutory order; or (2) [t]he emergence of new

material facts or a change of law occurring after the time of such order; or (3) [a] manifest failure

by the Court to consider material facts or dispositive legal arguments which were presented to the

Court before such interlocutory order."  Civ. L.R. 7-9(b).

Here, Mr. t'Bear argues that "the bench trial produced substantially different evidence than

what Forman claimed in his pleadings, namely, that the MOU was not the final contract that had

amended the promissory notes, but that [the MOU] was an intermediate step toward the final

modification through the Secured Notes Program."  (Dkt. No. 228 at 17.)  However, what Mr.

t'Bear characterizes as a "new" material dispute warranting reconsideration is not new at all.  It is

instead an extension of the parties' dispute over the interpretation of the MOU and its effect on

Mr. t'Bear's personal liability to repay the promissory notes upon Mr. Forman's demand.  Mr.

t'Bear further fails to demonstrate "reasonable diligence" in asserting this purported "material

difference in fact" because it is based in part on his *own* testimony at trial regarding his

interpretation of the MOU, and Mr. Forman's interpretation of same.  Because the MOU is central

to Mr. Forman's counterclaims, Mr. t'Bear could have discovered such evidence "earlier in the

litigation."  *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (holding

that a motion for reconsideration "may *not* be used to raise arguments or present evidence for the

first time when they could reasonably have been raised earlier in the litigation").

Finally, the motion fails to comply with Local Rule 7-9(c), which prohibits "repetition of

argument"; specifically:

> No motion for leave to file a motion for reconsideration may repeat *any* oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered. Any party who violates this restriction shall be subject to appropriate sanctions.

Civ. L.R. 7-9(c) (emphasis added). As previously discussed, Mr. t'Bear asserts that evidence produced at trial—specifically, his testimony regarding the Secured Notes Program and interpretation of how the loans to Mr. Forman were to be repaid—gives rise to a new material dispute over the method of repayment of the loans at issue, and whether the MOU was the final contract that amended the promissory notes or whether it was instead "an intermediate step toward the final modification through the Secured Notes Program." (*See* Dkt. No. 228 at 17.) Mr. t'Bear cites his testimony at trial asserting that: "The MOU is very specific that Urso would be the method of repayment, and I have always stood behind Urso." (*See id.* (citing Dkt. No. 219 at 74:6-10).) However, that testimony is consistent with Mr. t'Bear's previous assertions that "[t]he MOU not only made it clear that the Intellectual Property was being assigned to FairWay IP Holdings Ltd. but that repayment of the Demand Notes would come from Urso, Ltd." (*See* Dkt. No. 119 at 12.)

Further, Mr. t'Bear's opposition to Mr. Forman's motion for summary judgment on his counterclaims presented arguments regarding the Secured Notes Program and its relation to the MOU. (*See* Dkt. No. 118 at 18 (asserting that "[t]he implementation of the MOU was to support a new Secured Notes program and had nothing to do with a $6 Million financing candidate."); *see also id.* at 19 (arguing that Mr. Forman "co-designed . . . a Secured Notes program bringing in another (approximately 100 additional stakeholders)", 20 (asserting that "the consideration to sign the MOU was that [Mr. Forman] was a partner and [he] perceived that the Secured Note program with the collateral unencumbered by prior interest would further his interest as a partner")). Mr. t'Bear's opposition to Mr. Forman's motion for summary judgment on Mr. t'Bear's claims likewise argued that "[t]he terms of the MOU allowed the partnership to conduct a fresh fundraising Secured Note program that would be unencumbered by any prior liens on the [FairWay IP]." (*See* Dkt. No. 119 at 12.) Indeed, Mr. t'Bear's instant motion recognizes that his

7

"reference to the Secured Notes Program has been replete throughout this litigation." (*See* Dkt. No. 228 at 13.) That Mr. t'Bear's testimony at trial now appears to conflict with those arguments does not make them "new" for purposes of a motion for reconsideration. (*See* Dkt. No. 219 at 110:10-111:7 (testifying that the "Secured Notes Program" was "separate" from and represents a modification of the MOU).) Instead, it goes to his credibility as a witness.

Accordingly, the Court denies Mr. t'Bear's Rule 54(b) motion because it fails to comply with Local Rule 7-9.

### III.     Amendment of Counterclaim to Conform to Proof

Federal Rule of Civil Procedure 15(b) concerns amendment of the pleadings during and after trial, and provides:

> (1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.
>
> (2) *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

The Rule "embodies a liberal policy in favor of allowing pleading amendments at any time during and even after trial." *Consol. Data Terminals v. Applied Dig. Data Sys., Inc.*, 708 F.2d 385, 396 (9th Cir. 1983). "The purpose of Rule 15(b) is to align the pleading to conform to the issues actually tried." *Cole v. Layrite Prods. Co.*, 439 F.2d 958, 961 (9th Cir. 1971). Rule 15(b) "does not permit amendments to include issues which may be inferentially suggested by incidental evidence in the record." *Id.* The amendment of pleadings to conform to proof under Rule 15(b) "rests in the sound discretion of the trial court." *Id.*

Mr. t'Bear objected in his July 2019 pretrial brief to Mr. Forman's introduction of evidence regarding the theory underlying his rescission counterclaim—failure of consideration based solely on Mr. t'Bear's dilution of his 100% ownership of Urso, Ltd. (Dkt. No. 207 at 2.)

Mr. t'Bear argued that introduction of such evidence would be improper under Rule 15(b) because Mr. Forman failed to plead the dilution theory in his second amended counterclaim and subsequently failed to request leave to amend pursuant to Rules 15 and 16. (*Id.* at 4-5 (citing, among others, *Galindo v. Stood Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986) (noting that "amendment that seeks to conform the pleadings to proof introduced at trial is proper . . . unless it results in prejudice to one of the parties").)

Mr. t'Bear's argument regarding prejudice is unpersuasive because Mr. Forman's dilution theory does not reflect a *new* claim that is not pleaded in the second amended counterclaim. Instead, Mr. Forman pleaded a claim for rescission of the MOU based on failure of consideration, (*see* Dkt. No. 84 at 12-14), and discovered a new theory underlying that claim through Mr. t'Bear's July 2018 deposition testimony.[5] Further, and more importantly, Mr. t'Bear was aware of the "dilution theory" in October 2018 when Mr. Forman argued it in his motion for summary judgment on his counterclaims. (*See* Dkt. No. 99 at 23-25.) Indeed, Mr. t'Bear's opposition to Mr. Forman's motion for summary judgment directly addresses the dilution theory. (*See* Dkt. No. 116 at 32-35 (addressing rescission counterclaim and arguing that Mr. t'Bear "did not transfer or sell one share of his shares in Urso, Ltd.," and "[Mr. Forman] is totally wrong in this assumption").) In other words, the issue has already been "(pre)tried by implied consent of the parties." *See Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (10th Cir. 2005) (concluding that where race discrimination claim was "(pre)tried" at the summary judgment stage Rule 15(b)(2) did not require amendment to conform to the issues litigated). Thus, there is no prejudice to Mr. t'Bear in adjudicating the rescission claim under that theory. *See Galindo*, 793 F.2d at 1513 (noting that amendment is proper where "the record . . . indicate[s] that the parties understood that the evidence was aimed at an unpleaded issue" and finding that complaining party

---

[5] Mr. t'Bear's post-trial closing argument notes that the Court informed him "as a *pro se* litigant" at the January 31, 2019 hearing on the parties' cross motions for summary judgment that it was only adjudicating the counterclaims filed in July 2018, and then reiterated in the February 2019 Order that "it is only adjudicating the counterclaims asserted in [Mr. Forman's] July 19, 2018 second amended counterclaim." (*See* Dkt. No. 227 at 68 (quoting Dkt. No. 142 at 41).) The Court's statements are consistent with its determination that the dilution theory does not reflect a *new* counterclaim.

United States District Court
Northern District of California

1    was not prejudiced by post-trial amendment of pleadings because "the record [was] replete with

2    direct references" to the issue); *see also* Fed. R. Civ. P. 15(b)(1) ("The court should freely permit

3    an amendment when doing so will aid in presenting the merits and the objecting party fails to

4    satisfy the court that the evidence would prejudice that party's action or defense on the merits.").

5        The Court addressed Mr. t'Bear's pretrial objection at the August 2019 pretrial conference

6    and stated that Mr. Forman's dilution theory constituted "an amendment that will be allowed to

7    conform to the evidence." (Dkt. No. 212 at 32:5-11.) The Court noted that the issue of Mr.

8    t'Bear's dilution of his ownership interest was not brought to Mr. Forman's attention until Mr.

9    t'Bear's July 2018 deposition and the Court had subsequently conducted multiple discovery

10   hearings on the issue. Further, the parties briefed the issue at length in their summary judgment

11   filings and Mr. t'Bear represented to the Court that he "quit-claimed" the transfer of ownership

12   shares. (*See id.*) In other words, the issue had been actively litigated since at least October 2018.

13       Mr. t'Bear's co-counsel, Mr. Moore, recognized at the pretrial conference that the Court

14   would allow amendment to conform to proof and that "the objection's been mooted." (*See id.* at

15   41:11-12.) Mr. Moore then raised the issue again at trial:

16           MR. MOORE: So as I understand it, based on the pretrial conference,
             you're inclined to allow them to conform to proof.
17

18           THE COURT: Correct.

19           MR. MOORE: And as I understand the law on it, is that if that is the
             theory upon which they are presenting, that that is how it's supposed
20           to work. They say: This is our theory. What I'm not clear on is, is that
             it? Is that what we're trying here, is just the narrow claim that they
21           discovered some act of dilution that occurred right before the
             litigation began that they are seeking to conform to proof on. Because
22           that certainly is something I need to know.

23           THE COURT: Of course. That's my understanding. Why don't we
             have Mr. Jaeger summarize, do what his opening is so that we have
24           clarity.

25           MR. JAEGER [Mr. Forman's counsel]: Yeah. So I think it is clear. I
             think our trial brief is clear. So, and it states what we're moving at trial
26           to prove, which is that the MOU was breached because of the dilution
             of shares by Mr. Avery. That is solely the basis of consideration that
27           we are seeking to prove at trial.

28           MR. MOORE: Perfect.

(Dkt. No. 218 at 6:20-7:16.) Mr. Forman reiterated his argument that amendment was not necessary because he pleaded a rescission claim for failure of consideration:

> MR. JAEGER: Mr. Moore keeps repeating that we didn't plead this claim. We pled the claim. We pled the claim for rescission of the MOU under failure of consideration. We then learned, as one does in discovery, when we finally got to take his deposition we learned additional facts supporting that claim. So our position is we don't need to amend our claim, but if the Court wants us to, we will do that to conform to proof. And that may be the best thing to do at the end of the day, but our view is we didn't need to amend our claim.

(*Id.* at 11:2-11.)

Mr. t'Bear's post-trial closing argument revives his Rule 15(b) objection. (*See* Dkt. No. 227 at 49-61.) His arguments remain unavailing because he fails to show any prejudice that would result in allowing amendment; especially given that Mr. t'Bear has been aware of and has actively argued against the dilution theory since October 2018. Further, to the extent Mr. t'Bear argues that the Court cannot amend the counterclaim *sua sponte* because of his pretrial objection, the Court need not do so because Mr. Forman's post-trial reply brief includes a formal request to amend the pleadings. (*See* Dkt. No. 233 at 22-23.) Accordingly, the Court amends the pleadings to include the dilution theory because doing so clearly serves "[t]he purpose of Rule 15(b) . . . to align the pleading to conform to the issues actually tried." *See Cole*, 439 F.2d at 961.

## IV. Motions in Limine

### A. Mr. t'Bear's Motions

At the August 2019 pretrial conference, the Court denied Mr. t'Bear's Motion in Limine No. 1, which sought to prohibit Mr. Forman from "rebut[ting] the presumption that this Court announced it would be applying at trial [regarding] the existence of a partnership," (*see* Dkt. No. 201 at 2), because the Court never announced such a presumption and more importantly, the existence of a partnership was irrelevant to the rescission counterclaim, (*see* Dkt. No. 212 at 21:20-22, 26:16-24). The Court next addressed Motions in Limine Nos. 2 and 3, concerning the introduction of Mr. Forman's statements and judicial admissions in support of Mr. t'Bear's equitable defenses, (*see* Dkt. Nos. 202 at 2 & 203 at 2), and advised Mr. t'Bear that at trial he could provide evidence in support of his asserted defenses, provided it was relevant, (Dkt. No. 212

at 22:9-12). Further, the Court advised the parties that it would allow them to file closing arguments after the trial, at which point Mr. t'Bear could reassert his equitable defenses. (*See id.* at 27:17-21, 28:19-22.) The Court similarly addressed Motion in Limine No. 4, which concerned whether the Court could grant the relief Mr. Forman seeks under the Declaratory Judgment Act, (Dkt. No. 204 at 2), and advised Mr. t'Bear the he would "have the opportunity to argue why, based on the evidence that was presented, [the Court] can't exercise [its] discretion [under the Act], or at least, shouldn't." (*See id.* at 28:3-25.)

### B.    Mr. Forman's Motions

Mr. Forman filed only one motion in limine, seeking discovery sanctions pursuant to Rule 37(b)(2)(A) based on Mr. t'Bear's "failure to comply with the Court's April 5, 2019 order to produce 'all documents related to Urso Ltd. . . . and its ownership and assets from 2015 to present,' and the Court's follow-up April 18, 2019 Order to Show Cause, which emphasized that [Mr. t'Bear] was required to produce 'documents showing the original purported transfer of interest.'" (Dkt. No. 200 at 2.) The Court granted the motion in part, advising Mr. t'Bear that he would be precluded from referring to, relying on, or in any way hinting or suggesting that documents other than those he produced exist regarding the purported transfer. (Dkt. No. 212 at 33:16-35:16.)

### FINDINGS OF FACT

### I.    The FairWay IP

Beginning in 2006, Mr. t'Bear and Mr. Forman discussed plans for creating "a series of affiliated domestic and foreign companies" referred to by Mr. t'Bear as "The FairWay Group" ("FairWay"), to monetize intellectual property (the "FairWay IP") developed by Mr. t'Bear "for pricing offerings of securities and other assets." (Dkt. Nos. 1-1 at ¶ 6; 29 at ¶ 6; 99-1 at ¶ 3.) The entities involved include, "Urso Ltd (a Belize company) ("Urso"), FairWay IP Holdings, Ltd (a Cayman Island company) ("FairWay IP Holdings"), FairWay Financial U.S., Inc. (a Delaware company), FairWay Pricing Technologies, LLC (a Delaware company) [("FairWay Pricing")], and FairWay International Kft3 (a Hungarian company)." (Dkt. No. 99-1 at ¶ 3.)

In May 2008, Mr. t'Bear "assigned to Urso as corporate assets all personal patents,

1    trademarks, and business plans related to FairWay inventions or businesses." (Trial Ex. 117.)   In

2    December 2011, Mr. t'Bear transferred ownership of the FairWay IP from Urso to FairWay IP

3    Holdings in December 2011. (Trial Ex. 155.)  Urso owns 100% of FairWay IP Holdings, which

4    owns 100% of the FairWay IP.  (Dkt. No. 99-8, Ex. C at 64:2-23.)

5    **II.    The Loans**

6         Between April 2006 and October 2011, Mr. Forman made 33 loans to Plaintiff—in the

7    form of promissory notes—to fund FairWay.  The notes list Mr. Forman as the "Purchaser" or

8    "Lender." (Dkt. No. 99-2, Ex. 1-33.)  Between June 2007 and February 2016, Mr. t'Bear sent Mr.

9    Forman 19 emails attaching spreadsheets from a file entitled "Barry Forman Loan Manager"; the

10   spreadsheets include a summary page entitled "Personal Loans – Forman to Avery," listing

11   "Accumulated Loans with interest." (*See* Dkt. No. 99-3, Ex. 34-43, 45-53; *see also* Trial Ex. 125.)

12   The Loan Managers list the dates of the notes, beginning with the August 2006 note,[6] the principal

13   loan amount, and the principal plus accrued interest. Beginning with the March 2008 Loan

14   Manager, Plaintiff includes the following:

15               All principle and interest is due and payable on demand by Nathaniel
                 Caleb Avery
16               To the extent any collateral is held by Urso Limited [also owned by
                 Avery],
17               that collateral is pledged as well [to the extent necessary to fully repay
                 both principle and interest]
18
19               Signed by Nathaniel Caleb Avery both individually
                 and as Chairman and CEO of Urso Limited.
20               on behalf of Urso, Ltd.
                 Marina Towers, Suite 302,
21               Newtown Barracks, Belize City, Belize

22               N. Caleb Avery
                 [signed under the Electronic Signatures Act of 2000 [Public Law No:
23               106-229]] and legally binding upon all his assignees and heirs

24   (Dkt. No. 99-3, Ex. 40 at 67 (bracketed language in original).)  On February 29, 2016, Mr. t'Bear

25

26   _____

27   [6] Beginning with the December 2011 Loan Manager, Mr. t'Bear included a reference to the April
     2006 "$100K Convertible Debt Note with FairWay Pricing Technologies," and represented that
     "Nathaniel Caleb Avery and Urso Ltd will take personal and corporate responsibility to the extent
28   that Note is not repaid by FairWay Pricing Technologies according to its terms."  (*See* Dkt. No.
     99-4, Ex. 51 at 53.)

sent Mr. Forman the last Loan Manager; it references all 33 of the notes at issue in the underlying action. (Dkt. No. 99-4, Ex. 53 at 113-159; *see also* Trial Ex. 125.) The February 2016 Loan Manager removes the language above regarding collateral held by Urso, and states, in pertinent part:

> All principle and interest is due and payable on demand by Nathaniel Caleb Avery
>
> Signed by Nathaniel Caleb Avery both individually and as Chairman and CEO of Urso Limited. on behalf of Urso, Ltd. 35 New Road Belize City, Belize
>
> **Also includes $100K Convertible Debt Note with FairWay Pricing Technologies which Nathaniel Caleb Avery and Urso Ltd will take personal and corporate responsibility to the extent that Note is not repaid by FairWay Pricing Technologies according to its terms.

(*Id.*) Thus, as of February 2016 Mr. t'Bear characterized the loans as "Personal Loans – Forman to Avery" and represented that he was individually responsible for payment of the notes upon Mr. Forman's demand. Based on the Loan Managers that post-date the MOU and Mr. Forman's direct involvement in FairWay, the Court rejects Mr. t'Bear's argument that the MOU and Secured Notes Program definitively "altered" the terms of payment for the promissory notes. As of February 2016, the notes remained demand notes payable by Mr. t'Bear.

### III. The MOU

In December 7, 2011, Mr. t'Bear emailed Mr. Forman the MOU, reflecting a discussion between the parties to reconfigure the "payout plan" for the loans made by Mr. Forman to Mr. t'Bear and amending the collateral for those loans so that Mr. t'Bear could obtain funding for FairWay through the sale of notes secured by the FairWay IP. (Trial Ex. 155.) In the cover email, Mr. t'Bear states, in pertinent part: "As you, [Mr. Forman], and I, discussed, as part of the paperwork Urso Ltd. is assigning the FairWay IP portfolio to an IP Holding company, FairWay IP Holdings Ltd. to securitize the $6M in Notes being offered." (*Id.*) Mr. t'Bear's email further states that he would repay Mr. Forman's loans by the end of 2012, "with a small [remaining] balance." (*Id.*)

Mr. t'Bear drafted the MOU, which is titled "Memorandum of Understanding – Amending General Notes Collateral Lien Terms." (*Id.*) It states, in its entirety:

To memorialize our verbal discussion/understanding, I [and Urso Ltd.] are working on a payout plan to you that would retire the series of Promissory Notes dated from 2006-2011 ("Notes"), summarized in the attached document [excel file – Loan Manager – Barry Forman – 1 Dec 2011].

Some of the individual Notes in the series have pledged my general and entire asset base [including patents assigned to Urso Ltd.] as collateral. As we discussed, as part of our current fundraising, the FairWay Intellectual Property (patents, trademarks, etc.) is being assigned from Urso Ltd. to FairWay IP Holdings Ltd. [Cayman Islands]. To complete that assignment, I would ask you to accept and confirm your understanding that Urso Ltd. would not have direct control over these Intellectual Property assets but continue to have indirect rights to them through its 100% sole ownership of FairWay IP Holdings. Specifically, while Urso would no longer have direct title to these assets, it would have rights to the cash flow from the licensing of those assets [net of FairWay IP Holdings obligations to maintain them (legal costs, filing fees, annuities, etc.)], such cash to be received as expense reimbursements or dividends from FairWay IP Holding to Urso. *In summary, your lien interest [per the Notes] would continue on my general assets including: 1) my 100% ownership of Urso Ltd.; 2) by proxy, Urso Ltd.'s majority ownership of FairWay International; 3) my shares in FairWay Financial U.S., Inc.; and 4) general assets. But it would specifically no longer include direct lien on FairWay Intellectual Property, but rather depend on Urso's sole ownership of FairWay IP Holdings for repayment of the Notes. The Notes (2006-2011), as a series, are amended to that understanding.*

(*Id.*)

Thus, the MOU amended the collateral securing Mr. Forman's loans to Mr. t'Bear by removing Mr. Forman's direct security interest in the FairWay IP. In exchange, Mr. Forman would continue to have a lien interest in Mr. t'Bear's general assets, including his "100% ownership of Urso." Mr. Forman signed the MOU and emailed it to Mr. t'Bear on December 12, 2011. (Trial Ex. 237.) Mr. Forman would not have signed the MOU if not for its provision giving him a lien interest in Mr. t'Bear's 100% ownership of Urso, which owned FairWay IP Holdings, because without the provision Mr. Forman would have no substantive collateral for his loans. As consideration for relinquishing his direct security interest in the FairWay IP, Mr. Forman emphasized to Mr. t'Bear the importance of the provision pledging Mr. t'Bear's 100% ownership of Urso" and it was understood between the parties that Mr. t'Bear would retain his complete ownership interest "until such time as [Mr. Forman's] debt, including principal and interest, was completely repaid." (Dkt. No. 218 at 43:23-46:6.)

15

## IV. Failure of Consideration

Mr. t'Bear did not repay Mr. Forman's loans by the end of 2012, and Mr. Forman did not demand payment on the loans because Mr. t'Bear requested more time. Mr. Forman withdrew from the FairWay venture in September 2015. In early 2016, the parties (through Mr. t'Bear's then-former attorney, Timothy Covington),[7] discussed a forbearance agreement whereby Mr. Forman would not demand payment on the loans in return for, among other things, restoration of Mr. Forman's direct security interest in the FairWay IP. Mr. t'Bear refused.

From April to August 2016, Mr. t'Bear and Mr. Covington discussed tactics intended to forestall Mr. Forman's efforts to collect on his loans and attach Mr. t'Bear's assets, including Mr. t'Bear's 100% ownership interest in Urso. Mr. Covington emailed Mr. t'Bear on August 3, 2016, stating: "[Mr. Forman] must know – perhaps his attorney made clear to him – that probably the most convenient approach for securing assets will be to access equity. An obvious thing for him to request will be a power of attorney from URSO as sole owner of [FairWay IP Holdings]." (Trial Ex. 206.) To prevent Mr. Forman from taking control of Urso, Mr. t'Bear and Mr. Covington devised a plan that involved reducing Mr. t'Bear's ownership share of Urso from 100% to 25% by issuing new Urso shares equaling 25% ownership to each of Mr. Covington, Charles Davis, and John Matthesen.

On August 6, 2016, Mr. t'Bear directed Mr. Covington to discuss the Urso ownership dilution plan with Mr. Davis. (Trial Ex. 223.) Mr. Covington did so, and emailed Mr. t'Bear, the following day, stating, in pertinent part:

> I explained the 4 Urso shareholder scenario at 25% which he likes. He asked me to summarize where things are with Barry and where I thought they might go, the latter being speculation. I described both your desire for mediation and arbitration in SF but acknowledged that other scenarios could unfold, including suit in Seattle. . . . I explained that even with a judgment [Forman] may never execute on it because he can't get to assets in Belize and the Caymans, respectively. Of

---

[7] Mr. Covington resigned from the California State Bar in 2014 and was not an attorney at the time of the discussions at issue. (*See* Dkt. No. 218 at 122:17-18.) Further, the Court has held that Plaintiff waived privilege regarding communications with Mr. Covington, (Dkt. No. 83 at 1), and Plaintiff did not file a motion for reconsideration of the Court's order. Plaintiff acknowledged during his deposition on July 26, 2018 that he waived privilege to those communications. (Dkt. No. 11-3, Ex. B at 8 ("I gave up on that and just waived privilege.").)

course, this new 4 shareholder approach could be key to thwarting the attachment of the assets. We also talked about an indemnity, which Charley seemed to want.

The next step may be to draft a share subscription agreement for Charley, John and me. It would help if I could see the documents of establishment of Urso Limited, for terminology among other things.

(Trial Ex. 207.) Sometime thereafter in August 2016, Mr. t'Bear caused Urso to issue the additional shares and dilute his ownership interest in Urso to 25%. Mr. t'Bear did not notify Mr. Forman of the issuance of additional shares and earlier directed Mr. Covington not to convey to Mr. Forman any information about Urso. The parties continued discussions regarding a forbearance agreement throughout 2016 and up until January 2017, when Defendant was served with Plaintiff's state court complaint. (Dkt. No. 99-1 at ¶ 72.)

On May 17, 2017, Mr. Forman sent Mr. t'Bear a demand letter, calling for the immediate payment of principal and interest on all outstanding loans; "specifically, those loans listed in [Mr. t'Bear's] document entitled "Loan Manager – Barry Forman – 31 Dec 2016" . . . as well as any and all other loans or advances from [Mr. Forman] to [Mr. t'Bear] or to any of [Mr. t'Bear's] affiliate companies." (Dkt. No. 99-2, Ex. B at 5.) The letter demanded payment by May 31, 2017. (Id.) Mr. t'Bear did not respond to Mr. Forman's demand by the deadline, and on June 12, 2017, Mr. Forman sent Mr. t'Bear written notice via email and certified mail that Mr. t'Bear "failed to make any payment of principal and interest as demanded by [Mr. Forman's]" May 2017 letter. (Dkt. No. 99-2, Ex. C at 7.) As previously discussed, the Court has granted summary judgment in Mr. Forman's favor on his counterclaim for breach of promissory notes. (See Dkt. Nos. 142 & 148.)

After Mr. Forman filed his second amended counterclaim seeking rescission of the MOU for failure of consideration, (Dkt. No. 84), Mr. t'Bear appeared for his deposition on July 25-26, 2018, pursuant to Court order, (see Dkt. No. 78).[8] Mr. t'Bear testified that prior to August 2016, he held a 100% ownership interest in Urso but after that date owned only 25% of the company. (Dkt. No. 99-8, Ex. C at 59:11-22, 60:19-21.) Mr. t'Bear refused to identify the owners holding

---

[8] Mr. t'Bear failed to appear at his originally scheduled deposition in April 2018 due to medical issues. (See Dkt. Nos. 58 at 2 & 64.)

the remaining 75% interest in Urso, referencing a nondisclosure agreement. (*Id.* at 59:1-25.) Mr. Forman did not know that Mr. Forman had diluted his ownership interest in Urso until Mr. t'Bear's July 2018 deposition. As previously discussed, in October 2018 Mr. Forman moved for summary judgment on his rescission counterclaim under the dilution theory.

## V. Mr. t'Bear's Credibility

Mr. t'Bear is not a credible witness regarding whether he diluted his ownership interest in Urso. In addition to his July 2018 deposition testimony, Mr. t'Bear made multiple pretrial representations to this Court that at times subsequent to the MOU he was *not* the majority shareholder of Urso. At the January 2019 hearing on the parties' cross motions for summary judgment, Mr. t'Bear represented to the Court that he did not presently control Urso; specifically:

> THE COURT: Okay. So you don't owe anything then, because [U]rso hasn't paid him.
>
> MR. TBEAR: He's not even contacted [U]rso on payment.
>
> THE COURT: Has [U]rso paid him?
>
> MR. TBEAR: Not to my knowledge.
>
> THE COURT: Well, you -- aren't you -- don't you control [U]rso?
>
> MR. TBEAR: No, I do not.
>
> THE COURT: You do not control [U]rso?
>
> MR. TBEAR: I do not.
>
> THE COURT: Okay. Well, that's a different matter.

(Dkt. No. 141 at 17:1-13.) Further:

> THE COURT: By the way, did you tell Mr. Forman that you were transferring your -- or selling your interest in [U]rso?
>
> MR. TBEAR: I did not sell --
>
> THE COURT: Why not?
>
> MR. TBEAR: -- my interest. I did not sell my interest.
>
> THE COURT: Well, I thought you said you don't control it. You did control it at the time of this MOU.
>
> MR. TBEAR: Correct.

THE COURT: And when you at some point transferred control, did you tell Mr. Forman that you had done so?

MR. TBEAR: I did not transfer control. I sold additional shares as part of the –

THE COURT: So you do then have control?

MR. TBEAR: I -- no. I -- I am not majority shareholder of the company.

THE COURT: At the time the MOU was issued, you were?

MR. TBEAR: Correct. I was.

THE COURT: And you had full control?

MR. TBEAR: Yes.

THE COURT: And as you stand here today, you tell me you don't have control?

MR. TBEAR: Correct.

THE COURT: Did you tell Mr. Forman when you did something that eliminated your control of Erso?

MR. TBEAR: No, and I was not required to, and he was not a [partner].

(*Id.* at 20:21-21:24.) At a case management conference on April 4, 2019, Mr. t'Bear represented to the Court that he "did not transfer any interest [in Urso] and the three people [involved in the business continuity program] have issued quit claims." (Dkt. No. 164 at 5:2-3.) Further:

THE COURT: So you are representing now, Mr. t'Bear, that you are the 100-percent owner of Urso and that Urso is the 100-percent owner of that FairWay IP?

MR. TBEAR: That's correct.

THE COURT: Okay, I think this is news to Mr. Jaeger.

MR. TBEAR: *The other owners have basically given up their ownership back to the company, which then my 25- percent becomes 100-percent* –

THE COURT: Okay.

MR. TBEAR: -- in that case. And the 100-percent ownership of Urso owns 100-percent of Fairway IP Holdings.

(*Id.* at 5:25-6:11 (emphasis added).) On April 29, 2019, Mr. t'Bear testified at his Court-ordered

deposition regarding ownership of Urso that as of December 31, 2016, he owned 25% of Urso.

Further:

> Q. Who are the other owners or holders of Urso stock as of December 31, 2016?
>
> A. Charles Davis, John Matthesen, and Timothy Covington.
>
> Q. And do I understand that -- Mr. Davis, Mr. Covington, and Mr. Matthesen, they each held 25 percent of Urso stock?
>
> A. Correct.

(Dkt. Nos. 200 at 44:16-23 & 219 at 21:4-14.)  Further:

> Q. So was there a particular time at which the four of you reached an agreement that Mr. Covington, Mr. Matthesen, and Mr. Davis would receive 25 percent of the shares of Urso?
>
> A. That certainly had all occurred at various points before August 6th when it was memorialized.
>
> Q. So as of August 6, 2016 --
>
> A. 2016.
>
> Q. -- each one of those men had agreed to receive shares of Urso stock?
>
> A. As part of their participation in the [business continuity plan].

(Dkt. No. 200 at 46:14-24.)  Mr. t'Bear testified that the agreement was oral, and that he was unsure if there was any documentation regarding the issuance of Urso stock to Mr. Covington, Mr. Davis, and Mr. Matthesen.  He further testified that as of April 29, 2019, he owned 100% of Urso.  Mr. Covington testified at his September 2018 deposition that Mr. t'Bear told him that he "transferred ownership [of Urso] to three other people."  (Dkt. No. 218 at 215:7-216:6.)

At trial Mr. t'Bear changed his testimony regarding the dilution of his ownership interest:

> Q. Now, as of - - December 31, 2016, you owned only 25 percent of Urso.  Correct?
>
> A. No.
>
> Q. That's not correct[?]
>
> A. That's not correct.

(Dkt. No. 219 at 5:23-6:2.)  Mr. t'Bear further testified that as of December 31, 2016, Mr.

Covington, Mr. Davis, and Mr. Matthesen did *not* each own 25% of Urso, and that he is and always has been the sole owner of Urso and his 26,000 shares represent a 100% ownership interest.[9]

Mr. t'Bear acknowledged his previous sworn deposition testimony and representations to the Court. Mr. t'Bear explained that at the time he made those statements—as late as April 29, 2019—he believed them to be correct. He then testified that *after* his April 2019 deposition he "went back and double-checked" with Mr. Covington, Mr. Davis, and Mr. Matthesen" and "[t]here were no documents for any issuance of shares." (*Id.* at 41:25-42:20.) Thus, Mr. t'Bear testified, the dilution of ownership never occurred.

Mr. t'Bear's testimony at trial is not credible for several reasons. First, Mr. t'Bear also testified that he "investigated" this issue *before* his April 29, 2019 deposition and obtained affidavits and quitclaims[10] (purportedly drafted by Mr. Covington) from Mr. Covington, Mr. Davis, and Mr. Matthesen demonstrating that those individuals never received Urso stock. (*See id.* at 46:17-23.) Indeed, at the April 4, 2019 case management conference Mr. t'Bear discussed the quitclaim documents with the Court. When questioned about this discrepancy at trial Mr. t'Bear clarified that he knew about the quitclaim documents for several weeks before his April 29, 2019 deposition. Despite such knowledge, however, Mr. t'Bear testified under oath at his April 29, 2019 deposition that in December 2016 he owned 25% of Urso and Mr. Covington, Mr. Davis, and Mr. Covington each owned 25% of the company. Mr. t'Bear did not assert otherwise in his pretrial filings and then changed his testimony at trial.

Second, Mr. t'Bear's explanation makes no sense. The Court does not believe that Mr. t'Bear—as the only executive, director, and president of Urso—would not investigate whether the company had actually issued additional shares, thereby diluting his 100% ownership interest.

---

[9] Mr. t'Bear testified at his deposition in July 2018 that a "cap table" exists that documents ownership of Urso shares. (Dkt. No. 219 at 25:5-26:23.) However, despite the Court's April 2019 Order that Mr. t'Bear provide Mr. Forman "with all documents related to Urso Ltd. and its ownership and assets from 2015 to the present," (*see* Dkt. No. 161), Mr. t'Bear acknowledged at trial that he did not produce the Urso cap table.

[10] The Court sustained Mr. Forman's objection to the introduction of the affidavits and quitclaims into evidence because they "are all hearsay statements" purportedly drafted by Mr. Covington that Mr. t'Bear could not authenticate. (Dkt. No. 219 at 48:13-50:21.)

Especially given that the dilution theory has been at issue in this litigation since October 2018. Mr. t'Bear did not think to ask Mr. Covington, Mr. Davis, and Mr. Matthesen whether they actually owned shares in Urso since August 2016, when the documentary evidence shows that Mr. t'Bear, Mr. Covington, and Mr. Davis were actively discussing the dilution plan? Mr. t'Bear just assumed for over 2.5 years that those individuals *did* own shares and gave sworn testimony and made representations to this Court in support of that assumption? No. The Court cannot accept Mr. t'Bear's explanation as true.

The only reasonable explanation, which is supported by contemporaneous emails and Mr. t'Bear's previous sworn testimony and judicial admissions, is that Mr. t'Bear caused Urso to issue additional shares to thwart Mr. Forman's attachment of Urso and the FairWay IP. Further, Mr. t'Bear's failure to fully comply with this Court's orders to produce all documents related to Urso and its ownership and assets from 2015 to the present, (*see* Dkt. Nos. 161 & 166), suggests that such documents are not favorable to his defense in this action. In the absence of any admissible documentary evidence demonstrating that the issuance of additional shares did *not* take place (i.e., contemporaneous emails or other communications between Mr. t'Bear and Mr. Covington, Mr. Davis, and Mr. Matthesen; the Urso cap table or other relevant corporate documents), the Court is left with Mr. t'Bear's dubious testimony at trial. That testimony is simply not credible.

Similarly, the Court cannot find that Mr. t'Bear currently owns 100% of Urso based solely on his representations to the Court, which have changed throughout these proceedings. The only finding of fact the Court can make on that score is that Mr. t'Bear owned 100% of Urso prior to August 2016.

**VI.  Mr. Covington's Credibility**

Mr. Covington testified that the Urso ownership dilution plan discussed in the August 2016 emails was only contemplated and not effectuated, and that it was discussed earlier in 2016 as part of a business continuity plan unrelated to Mr. t'Bear's dispute with Mr. Forman. Mr. Covington further testified that he has reviewed a document reflecting the business continuity plan for Urso but he does not know when he did so. As to whether Mr. t'Bear effectuated the dilution plan and caused Urso to issue the additional shares, Mr. Covington is not a credible witness.

In April or May of 2018, Mr. Covington "purged" from his computer all emails between himself and Mr. t'Bear regarding FairWay. Mr. Covington did so despite knowing that discovery in this case was ongoing. After Mr. Covington was subpoenaed in this action in August 2018, Mr. t'Bear created an email account and populated it with emails between himself and Mr. Covington to address the subpoena request for documents. Both Mr. t'Bear and Mr. Covington had access to the email account, but Mr. t'Bear alone selected the emails that went into the account and Mr. Covington did not review the emails that Mr. t'Bear withheld from the account. None of the emails post-date October 2016, despite continued, daily email correspondence between Mr. t'Bear and Mr. Covington after that date that numbered in the "thousands." (Dkt. No. 218 at 148:1-17.) The Court draws the only reasonable inference it can from such conduct—Mr. Covington deliberately purged emails unfavorable to Mr. t'Bear in this action.

## CONCLUSIONS OF LAW[11]

Mr. Forman's second amended counterclaim seeks "Declaratory Relief – Rescission" for failure of consideration. (Dkt. No. 84.) The Court previously noted that Mr. Forman's claim is in effect a claim that Mr. t'Bear breached the MOU by diluting his ownership interest in Urso. That is not technically correct, however. "A party who sues for breach of contract thereby affirms the contract's existence," whereas "rescission is a remedy that *disaffirms* the contract." *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1144-45 (2010). In other words, an action for rescission is not a breach of contract claim. Thus, the Court uses the term "breach" to mean "contravention."

## I.    The Declaratory Judgment Act

The Declaratory Judgment Act provides, in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

---

[11] The Court's legal analysis may contain findings of fact not included in the "findings of fact" section. The Court intends all statements of fact to constitute a finding of fact regardless of where they appear in this Opinion.

28 U.S.C. § 2201.

A court must first "inquire whether there is a case of actual controversy within its jurisdiction." *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). "[T]his requirement is identical to Article III's constitutional case or controversy requirement." *Id.* Even if jurisdiction exists, however, "[t]he Declaratory Judgment Act does not grant litigants an absolute right to a legal determination." *United States v. State of Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985). A court's decision whether to grant declaratory relief is instead "a matter of discretion." *Id.* "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *Id.* at 1357.

## A. The Court has Jurisdiction under the Act

Mr. Forman's counterclaim is premised on diversity jurisdiction under 28 U.S.C. § 1332 and the requirements for diversity are met: Mr. Forman and Mr. t'Bear are citizens of different states and the amount in controversy exceeds $75,000. (*See* Dkt. No. 84 at ¶¶ 1-3.) The Court must next determine whether the case is "ripe for review." *See Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 671 (9th Cir. 2005). "[T]he appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (internal quotation marks and citation omitted).

Here, there is a substantial controversy because the parties dispute whether Mr. t'Bear breached the MOU by diluting his ownership interest in Urso and their interests are clearly adverse. Further, the dispute has become sufficiently immediate. Because Mr. t'Bear diluted his ownership share in Urso in contravention of a material term of the MOU, then the primary source of collateral for Mr. Forman's loans is lost. *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir. 1986) ("A case is ripe where the essential facts establishing the right to declaratory relief have already occurred.").

Mr. t'Bear argues in his post-trial brief that the case is not ripe but instead "no longer

exists" because the Court has already afforded him a legal remedy by granting summary judgment on his breach of contract claim. (Dkt. No. 227 at 81.) This argument is grounded in Mr. t'Bear's assertion that California's "election of remedies" doctrine bars rescission of the MOU. As discussed in detail *infra* Section II.A, that argument fails.

### B. The Exercise of Jurisdiction is Warranted

In determining whether to exercise its discretion, the court must analyze the non-exclusive "factors set out in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 62 S. Ct. 1173, 86 L.Ed. 1620 (1942), and its progeny." *Robinson*, 394 F.3d at 669. Under *Brillhart*, district courts should: (1) "avoid needless determination of state law issues"; (2) "discourage litigants from filing declaratory actions as a means of forum shopping"; and (3) "avoid duplicative litigation." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998); *see also Kearns*, 15 F.3d at 144 ("Essentially, the district court must balance concerns of judicial administration, comity, and fairness to the litigants."). None of those factors caution against the Court's exercise of discretion here. First, declaring the MOU rescinded does not constitute a "needless determination of [a] state law issue[ ]" because this Court has diversity jurisdiction and there is no parallel state court proceeding. *See Dizol*, 133 F.3d at 1225. Second, there is no indication of forum shopping because Mr. Forman timely removed Mr. t'Bear's state court complaint to this Court and then filed a counterclaim. Third, Mr. Forman's rescission counterclaim is not duplicative because this is the only action between Mr. Forman and Mr. t'Bear in state or federal court. Further, "when other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *Id.* Such is the case here.

In addition to the *Brillhart* factors, the Ninth Circuit has "suggested other considerations," such as:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems.

United States District Court
Northern District of California

*Dizol*, 133 F.3d at 1225 n.5 (quoting *Kearns* 15 F.3d at 145 (J. Garth, concurring)).

Courts "might also consider the convenience of the parties, and the availability and relative

convenience other remedies." *Id.* (internal quotation marks and citation omitted). Consideration

of those additional factors likewise does not caution against the exercise of jurisdiction.

### 1. The declaration will settle the controversy between parties

Rescinding the MOU will clarify Mr. Forman's collateral rights and Mr. t'Bear's

obligations under the promissory notes and will settle the controversy in this action. Mr. t'Bear's

post-trial brief asserts that rescinding the MOU will "not settle all aspects of the controversy,

particularly given Forman's own involvement in the Secured Notes Program which modified the

MOU." (Dkt. No. 227 at 86.) As previously discussed, the Court rejects Mr. t'Bear's "Secured

Notes Program" argument because it is based on Mr. t'Bear's not credible trial testimony and

conflicts with the Loan Managers. Further, to the extent Mr. t'Bear argues that rescission will

"invite countless collateral litigation since nonparties are not bound by declaratory judgments,"

(*see id.*), his rights and obligations to nonparties are not the subject of this action.

### 2. The declaration will clarify the legal relations at issue

Again, rescinding the MOU will clarify Mr. Forman and Mr. t'Bear's respective rights and

obligations under the MOU and the underlying promissory notes and Loan Managers. Mr. t'Bear

asserts, in pertinent part:

> [P]utting Forman as a judgment creditor with his collateral restored
> against the patent portfolio, particularly in the convoluted form
> Forman sets forth in his Proposed Judgment (Dkt. No. 226-1) raises
> all kinds of uncertainty that will not serve a useful purpose in
> clarifying the legal relations at issue. FORMAN is proposing that this
> Court to attach/encumber the assets of FairWay IP Holdings, an entity
> that both parties admit is not a party to this action (i.e., an absent
> party) and an entity whose domicile is not even in this country. The
> FairWay IP has not been t'Bear's asset for over a decade and has not
> even been Urso's direct asset for some eight years. Indeed,
> FORMAN's unorthodox approach to this litigation is already fraught
> with legal and equitable infirmities.

(*Id.* at 88.) Again, however, the declaration will clarify the legal relations at issue in *this* litigation.

//

//

United States District Court
Northern District of California

### 3. The declaration is not being sought merely for purposes of procedural fencing or res judicata advantage.

Mr. Forman filed his counterclaims after being sued by Mr. t'Bear. In other words, Mr. Forman did not initiate the underlying litigation. Further, the dilution theory on which his rescission claim is based came to light during Mr. t'Bear's deposition in July 2018. Thus, there is no indication that Mr. Forman is seeking to rescind the MOU for any purpose other than restoring his direct security interest in the FairWay IP to collateralize the promissory notes.

To the extent Mr. t'Bear suggests that Mr. Forman's rescission counterclaim is "seeking post-judgment advantage" by attaching the FairWay IP to satisfy a monetary judgment, (*see* Dkt. No. 227 at 88), that kind of "advantage" does not weigh against the Court's exercise of jurisdiction. Indeed, it is the purpose of his counterclaim.

### 4. The declaration will not result in federal and state court entanglement

As previously discussed, there are no parallel state court proceedings in this case. Mr. t'Bear asserts that Mr. Forman "obtaining some other status than a mere judgment creditor is bound up in seeking post-judgment advantage that will undoubtedly lead to entanglement between the federal and state court systems," as well as "non-U.S. jurisdictions," because there are non-parties whose rights and obligations may be effected. (*Id.*) Again, there are currently no parallel proceedings. Further, the potential for subsequent litigation involving non-parties is a consideration, but it does weigh heavily here. The Court will not decline to adjudicate Mr. Forman's counterclaim on the grounds that it may affect non-parties because doing so would effectively insulate Mr. t'Bear from liability for his own breach.

### 5. Convenience of the parties and availability and convenience of other remedies

The most convenient forum for the parties is this Court; they have been litigating the underlying action here since February 2017. Rescinding the MOU is the only remedy that will restore Mr. Forman's direct security interest in the FairWay IP. Mr. t'Bear asserts that providing Mr. Forman a monetary judgment on his breach of contract claim "and the status of a judgment creditor is sufficient to protect [him]." (*Id.* at 87.) Perhaps. But the purpose of Mr. Forman's rescission claim is to restore his pre-MOU collateral rights. Rescission is the only remedy that

will do so.

In sum, consideration of the relevant factors weighs in favor of exercising jurisdiction to hear Mr. Forman's rescission counterclaim under the Declaratory Judgment Act.[12]

## II. Rescission

The remedy of rescission "extinguishes the contract . . ., terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received." *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1145 (2010). Under California law, a party may rescind a contract if, in pertinent part, "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds," or "[i]f the consideration for the obligation of the rescinding party, before it is tendered to him, fails in a material respect for any cause." Cal. Civ. Code § 1689(b)(2),(4). "[A] failure of consideration must be 'material,' or go to the 'essence' of the contract before rescission is appropriate." *Wyler v. Feuer*, 85 Cal. App. 3d 392, 403-04 (1978).

Here, the evidence demonstrates that the MOU amended the collateral securing Mr. Forman's loans to Mr. t'Bear. In exchange for Mr. Forman relinquishing his direct security interest in the FairWay IP, Mr. t'Bear pledged, in part, that Mr. Forman's lien interest "would continue on [Mr. t'Bear's] general assets including[ ] . . . [his] 100% ownership of Urso Ltd." (Trial Ex. 155.) The evidence demonstrates that Mr. t'Bear's continued ownership of Urso was a material, and indeed, the critical term of the MOU and that the parties understood it as such. The evidence further demonstrates a failure of consideration because Mr. t'Bear diluted his ownership interest in Urso at some point in late 2016. Thus, rescission is warranted.

---

[12] The Court rejects Mr. t'Bear's argument that by seeking rescission of the MOU under the Act Mr. Forman is asking "this Court to engage in a post hoc reformation of his demand notes to ameliorate his voluntary relinquishment of his collateral in the FairWay IP since pledged to other investors." (Dkt. No. 227 at 91 ("What Forman is proposing cannot by accomplished under the Declaratory Judgment Act.").) Mr. t'Bear is mistaken. Mr. Forman is seeking only a declaration that the MOU is rescinded, thereby restoring his direct security interest in the FairWay IP. Such relief is available under the Act. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.").

Mr. t'Bear offers several arguments as to why Mr. Forman cannot rescind the MOU. None are persuasive.

### A. "Election of Remedies" Doctrine Does Not Bar Rescission

Mr. t'Bear argues that because Mr. Forman obtained summary judgment on his breach of contract claim regarding the promissory notes, he cannot obtain the remedy of rescission for the MOU, which modified the notes, because doing so "implicates California's election of remedies doctrine." (Dkt. No. 227 at 41.) The Court is not persuaded.

California courts have described the election of remedies doctrine as follows:

> Whenever a party entitled to enforce two remedies either institutes an action upon one of such remedies or performs any act in the pursuit of such remedy, whereby he has gained any advantage over the other party, or he has occasioned the other party any damage, he will be held to have made an election of such remedy, and will not be entitled to pursue any other remedy for the enforcement of his right.

*Roam v. Koop*, 41 Cal. App. 3d 1035, 1039-40 (1974) (internal quotation marks and citations omitted). Further:

> An action for rescission is based on the disaffirmance of the contract and an action for damages for breach of contract is based on its affirmance. An action for rescission and an action for breach of contract are alternative remedies. The election of one bars recovery under the other.

*Akin v. Certain Underwriters at Lloyd's London*, 140 Cal. App. 4th 291, 296 (2006). In other words, a party cannot seek to both affirm and disaffirm the same contract.

Mr. t'Bear's argument is that Mr. Forman "split his contract claims into two: one pre-[MOU] amendment for his legal remedy of breach of contract and the other post-amendment (MOU) for his equitable remedy for rescission," (Dkt. No. 227 at 43), and that because California law provides that "an amended contract supersedes the original contract," this Court erred in granting summary judgment "on no longer existing contracts (promissory notes)." (Dkt. No. 227 at 46-47 (citing Cal Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.")).) Not so.

The record demonstrates that the MOU amended the promissory notes only as to the

collateral securing the loans; specifically, by removing Mr. Forman's direct lien on the FairWay IP. Indeed, Mr. t'Bear drafted the MOU and entitled it: "Memorandum of Understanding – Amending General Notes Collateral Lien Terms." (*See* Trial Ex. 255.) Thus, because "a modification only supersedes the terms to which it relates[,]" *see Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995), the MOU only concerns the collateral securing the loans, it does not concern Mr. t'Bear's obligation to repay the notes upon Mr. Forman's demand. Indeed, the subsequent Loan Managers, issued by Mr. t'Bear to Mr. Forman as late as February 2016, acknowledged that the promissory notes were *still* demand notes for which Mr. t'Bear remained individually liable. Mr. t'Bear's argument assumes that the Court granted summary judgment on Mr. Forman's breach of contract counterclaim based solely on the pre-MOU promissory notes, independent of the post-MOU Loan Managers. That is not the case, however. The Court's summary judgment order discusses the Loan Managers in detail, (*see* Dkt. No. 142 at 4-5), and concludes that they "clearly reflect Plaintiff's express recognition that he is individually liable for payment of the notes on demand," (*id.* at 24-25).

Mr. Forman's rescission counterclaim seeks to disaffirm only the amendment to the underlying promissory notes reflected in the MOU and his breach of contract claim seeks damages for breach of the promissory notes themselves. The latter concerns the debt actually owed and the former concerns only the collateral for that debt. Again, the terms of the post-MOU Loan Managers, which were drafted by Mr. t'Bear subsequent to the MOU, demonstrate that he is still personally liable for payment on demand, as he was before the MOU. In other words, rescission of the MOU would not extinguish the debt, it would only extinguish the terms of collateral. Thus, this is not a case where a party is impermissibly seeking to both affirm and disaffirm a single contract.

Further, even if the MOU and promissory notes reflect a single contract, rescission of the MOU is available here. "The general rule is that one must rescind all of his contract"; however, that rule does not apply "in the case of a severable or divisible contract." *Simmons v. California Inst. Of Tech.*, 34 Cal. 2d 264, 275 (1949). "[T]he test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the

contract may be regarded as severable." *Id.* Further, "a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." *See id.* (noting that "where a good cause for rescission exists as to one part of a divisible or separable contract, such portion may be rescinded in equity without disturbing the remainder.").

Here, the consideration is apportioned between the promissory notes and the MOU. The consideration for the initial promissory notes and subsequent Loan Managers was Mr. t'Bear's promise to repay the principal with interest upon Mr. Forman's demand. Consideration for Mr. Forman relinquishing his direct security interest in the FairWay IP pursuant to the MOU was Mr. t'Bear's promise to retain complete ownership of Urso. Thus, if the MOU and promissory notes constitute a single contract it is divisible and good cause exists to sever the MOU and rescind it based on failure of consideration.

Accordingly, Mr. Forman's election of legal and equitable remedies in this case does not run afoul of the election of remedies doctrine.

### B.    "Primary Right" Doctrine Does Not Bar Rescission

Mr. t'Bear similarly argues that "splitting the contract over two remedies violates California primary rights [sic] doctrine." (Dkt. No. 227 at 43.) As explained by the California Supreme Court:

> The primary right theory is a theory of code pleading that has long been followed in California. It provides that a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty. (*McKee v. Doud* (1908) 152 Cal. 637, 641 [93 P. 854].) The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. (*Slater v. Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) A pleading that states the violation of one primary right in two causes of action contravenes the rule against "splitting" a cause of action. (*Wulfjen v. Dolton* (1944) 24 Cal.2d 891, 894-895 [151 P.2d 846].)

*Crowley v. Katleman*, 8 Cal. 4th 666, 681 (1994). "[T]he primary right is simply the plaintiff's right to be free from the particular injury suffered." *Id.* Further, "[t]he primary right must . . . be distinguished from the *remedy* sought: The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not

to be confounded with the cause of action, one not being determinative of the other." *Id.* at 682 (internal quotation marks and citation omitted).

Mr. t'Bear's "primary right" argument fails for the reasons previously stated; specifically, the MOU amended only the collateral for the loans and did not amend his obligation to repay them. Thus, Mr. Forman's counterclaims for breach of contract of the promissory notes and rescission of the MOU do not divide or "split" a single cause of action, but instead reflect separate claims for separate injuries. Further, "[t]he primary right theory has a fairly narrow field of application," and "is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits." *See id.* That is not the case here.

### C.    Mr. t'Bear Cannot "Cure" the Failure of Consideration

Mr. t'Bear's post-trial brief asserts "there was a complete lack of proof of dilution and/or Forman did not rebut the evidence that t'Bear cured any such perceived dilution." (Dkt. No. 227 at 69.) The Court disagrees on both scores. As previously discussed, the proof of dilution consists of contemporaneous emails between Mr. t'Bear, Mr. Covington, and Mr. Davis, as well as Mr. t'Bear's previous sworn testimony and judicial admissions. The only "evidence" that Mr. t'Bear "cured" the dilution consists of his testimony at trial that he investigated the issue and obtained quitclaims from the individuals involved in the dilution plan. Again, the Court rejects that testimony, and the quitclaim documents were properly excluded as inadmissible hearsay. Thus, the Court finds that the failure of consideration has not been cured.

Mr. t'Bear asserts that Mr. Forman's "factual concession" in his post-trial brief that "Mr. t'Bear asserts that he is now the 100% owner of Urso" serves as "an estoppel against any inference that t'Bear diluted his 100% shareholder interest in Urso, Ltd. and/or that t'Bear's cure of any perceived dilution is not legally effective." (*Id.* at 70.) The Court rejects that argument. Mr. Forman's statement merely reflects Mr. t'Bear's testimony, it has no bearing on whether the testimony is credible. Further, and more importantly, Mr. t'Bear presents no authority that a party may subsequently "cure" a knowing and willing contravention (i.e., breach or repudiation) of a contract's terms, keep that contravention hidden, and then attempt to cure it after it is discovered and legal action is taken by the other party.

### D.      Mr. t'Bear's Affirmative Defenses

Mr. t'Bear's pretrial filings referenced the following affirmative defenses: (1) "Laches"; (2) "Waiver and Estoppel"; (3) "Inequity"; and (4) "Unclean Hands."  (*See* Dkt. No. 189 at 6-10.) The Court addresses them in turn.

#### 1.      Laches

"Laches may bar relief in equity to those who neglect their rights, where such neglect operates to the detriment of others."  *Bono v. Clark*, 103 Cal. App. 4th 1409, 1417 (2002).  The defense "requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay."  *Id.* (internal quotation marks and citation omitted).  Under the California Civil Code, a laches defense to rescission requires a showing of "substantial prejudice."  Cal. Civ. Code § 1693 ("When relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party.").

Mr. t'Bear asserts the defense and argues that Mr. Forman failed to act diligently in seeking to rescind the MOU.  However, Mr. t'Bear's argument is based on the rescission theory as originally pleaded (i.e., failure of consideration because Mr. t'Bear did not obtain $6 million in financing to repay Mr. Forman in 2012), (*see* Dkt. No. 227 at 79-80).  It is not based on the dilution theory, which is the operative theory of the case, (*see supra* pp. 8-11).  As previously discussed, Mr. Forman did not learn of the dilution theory until Mr. t'Bear's July 25-26, 2018 deposition; Mr. Forman then moved for summary judgment under that theory on October 4, 2018. Mr. t'Bear's post-trial briefing cites no evidence demonstrating "substantial prejudice" due to any delay between July 2018 and October 2018.  *See* Cal. Civ. Code § 1693.  In the absence of evidence of substantial prejudice, Mr. t'Bear's laches defense fails.

#### 2.      Waiver and Estoppel

Mr. t'Bear's pre-trial briefing and post-trial closing argument address waiver and estoppel in the context of the election of remedies doctrine; that defense fails for the reasons previously stated.  Mr. t'Bear also asserts that "[e]stoppel as a defense to rescission may be found where a party seeking the remedy of rescission, upon discovery or notification of the grounds therefor, . . .

33

does not act within a reasonable time to rescind." (*See* Dkt. Nos. 189 at 29-30 & Dkt. No. 227 at 79.) The latter is the same argument concerning Mr. t'Bear's laches defense and it fails for the same reason.

### 3. Inequity

Mr. t'Bear's pre-trial briefing recognizes that "inequity" is "[n]ot an actual affirmative defense," but asserts that "California law prevents rescission 'where the rights of others have intervened and the circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights.'" (Dkt. No. 189 at 30-31 (quoting *Beckwith v. Sheldon*, 165 Cal. 319, 324 (1913)).) The post-trial brief repeats this assertion. (*See* Dkt. No. 227 at 80.) This argument fails, however, because the Court has already made clear at the pretrial conference in its discussion of Mr. t'Bear's Rule 19 motion that rescinding the MOU does not give Mr. Forman a *priority* lien on the FairWay IP over other alleged investors. (*See* Dkt. No. 212 at 13:9-20:6.) Instead, it restores only his direct security interest. That Mr. t'Bear may have pledged that same collateral to other lenders does not render rescission of the MOU, which was between Mr. Forman and Mr. t'Bear, inequitable.

### 4. Unclean Hands

To invoke this defense, the alleged misconduct constituting "unclean hands" "must relate directly to the transaction concerning which the complaint is made," and "[t]he misconduct must infect the cause of action before the court." *Carman v. Athearn*, 77 Cal. App. 2d 585, 598 (1947). Mr. t'Bear's pre-trial briefing asserts that Mr. t'Bear "intend[ed] to produce evidence that will demonstrate that Forman's own misconduct relates directly to the MOU he seeks to rescind," and provides a list of alleged misconduct. (*See* Dkt. No. 189 at 31-32.) However, none of the alleged misconduct relates "directly to the transaction concerning which complaint is made"—Mr. t'Bear's dilution of his ownership interest in Urso. The alleged misconduct instead relates generally to the MOU and the manner in which Mr. Forman has prosecuted his counterclaims. (*See* Dkt. No. 189 at 31-32.) In any event, Mr. t'Bear did not prove any unclean hands defense at trial.

### III.    Injunctive Relief

During his trial testimony, Mr. t'Bear promised the Court that he would not dilute his claimed 100% ownership of Urso during the "pendency of this case," which his counsel defined as "when evidence ends, submission to the Judge for a ruling, any post-trial motions, any appellate procedures by either party, and any attempts for satisfaction of judgment, until satisfaction of judgment of any final judgment on appeal." (Dkt. No. 219 at 40:20-41:10.) Mr. t'Bear then confirmed that promise to Mr. Forman's counsel and clarified that during the pendency of the case he would not cause Urso to issue additional shares, change Urso's 100% ownership of FairWay IP Holdings, and would not "move the FairWay IP from FairWay IP Holdings." (*Id.* at 321:2-17.) The Court instructed Mr. t'Bear at the close of trial that his promises constituted an "order of the Court," until the Court issued its judgment, and Mr. t'Bear indicated that he understood. (*Id.* at 341:6-342:9.)

Mr. Forman requests that "the Court continue that injunction through the final resolution of the matter, including all appeals and collection efforts." (Dkt. No. 226 at 30.) Mr. Forman requests injunctive relief to prevent "Mr. t'Bear from taking steps to 'thwart' Mr. Forman's ability to pursue his collateral rights in the FairWay IP." (*Id.* at 29.) Mr. Forman asserts that an injunction is necessary because Mr. t'Bear "has no assets with which to repay Mr. Forman's loans (other than the possibility of monetizing the FairWay IP)," and Mr. t'Bear previously "block[ed] Mr. Forman from exercising his collateral rights in Mr. t'Bear's claimed 100% ownership of Urso" by diluting his ownership interest. (*Id.*)

Mr. t'Bear asserts that injunctive relief is unavailable because: (1) Mr. Forman's second amended counterclaim does not plead a request for injunctive relief and he "never sought leave to amend his counterclaims to request such relief"; (2) Mr. Forman "never availed himself of the federal procedures governing injunctions found in Federal Rules of Civil Procedure 65; (3) the Court cannot grant injunctive relief pursuant to the Declaratory Judgment Act; and (4) Mr. Forman "presented no evidence at the bench trial to demonstrate the requirements necessary to obtain an

injection."[13]  (Dkt. No. 227 at 91-93.)  The Court addresses Mr. t'Bear's arguments in turn.

## A.    Failure to Plead Request for Injunctive Relief

Mr. Forman's second amended complaint does not plead a request for injunctive relief. (*See generally* Dkt. No. 84.)  Mr. Forman asserts, however, that his request for injunctive relief is intertwined with his discovery of the dilution theory underlying his claim for rescission, and notes that "Mr. t'Bear has known for a year that Mr. Forman seeks an injunction."  (Dkt. No. 233 at 42.) Indeed, Mr. Forman's October 2018 motion for summary judgment requested injunctive relief. Mr. Forman's post-trial reply brief "formally requests leave to amend his pleading to conform to proof" and include his request for injunctive relief.  (*Id.* at 43.)  Because the Court grants amendment to conform to proof as to the dilution theory, it likewise grants amendment to plead a request for injunctive relief based on that theory for the reasons stated above, (*see supra* at 8-11).

## B.    Compliance with Rule 65

Mr. t'Bear asserts that in addition to failing to plead a request for injunctive relief, Mr. Forman did not comply with "the requirements set forth in Federal Rule of Civil Procedure 65 for the issuance of either a preliminary or permanent injunction."  (Dkt. No. 227 at 95-96 (citing Fed. R. Civ. P. 65(a)-(d)).)  However, Rules 65(a)-(c) are not relevant at this stage because they concern preliminary injunctions and temporary restraining orders, and there is no requirement that a party move for such relief prior to seeking a permanent injunction.  Mr. Forman is instead seeking a permanent injunction after a trial on the merits.  Thus, only Rule 65(d) is relevant because it pertains to the "Contents and Scope of Every Injunction and Restraining Order."  Fed. R. Civ. P. 65(d).  The Rule requires that an order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  As discussed below, the Court is not granting injunctive relief, so Rule 65(d)

---

[13] Mr. t'Bear further argues that injunctive relief is inappropriate because Mr. Forman's proposed judgment indicates that he is seeking "equitable subordination" whereby he will obtain a priority lien interest in the FairWay IP.  (*See* Dkt. No. 227 at 98-100.)  However, as previously discussed, and as the Court confirmed at the August 2019 pretrial conference, Mr. Forman is not seeking a priority lien interest.  (*See* Dkt. No. 212 at 13:14-25 ("Mr. Moore: You're not going to give an order that puts him ahead of the 160 investors[?]  The Court: Exactly.").)

is not applicable.

**C.      Injunctive Relief Under the Declaratory Judgment Act**

Mr. t'Bear next asserts that the Court cannot grant injunctive relief pursuant to the

Declaratory Judgment Act.  (Dkt. No. 227 at 96-98.)  Mr. t'Bear is mistaken.  It is true that a

declaratory judgment does not constitute injunctive relief or have the same effect.  *Steffel v.*

*Thompson*, 415 U.S. 452, 467 (1974) (recognizing that "[t]he express purpose of the [Act] was to

provide a milder alternative to the injunction remedy").  That does not mean, however, that a party

cannot bring a claim for declaratory relief under the Act *and* seek an injunction if the requirements

for the latter are met.  *See, e.g.*, 28 U.S.C. § 2202 ("Further necessary or proper relief based on a

declaratory judgment or decree may be granted, after reasonable notice and hearing, against an

adverse party whose rights have been determined by such judgment."); *Powell v. McCormack*, 395

U.S. 486, 499 ("A declaratory judgment can . . . be used as a predicate to further relief, including

an injunction.") (citing 28 U.S.C. § 2202)); *Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1981)

(affirming district court's issuance of an injunction to effectuate declaratory judgment under the

Act); *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569, 575 (9th Cir. 1980) (noting that the

Act empowers district courts "to grant supplemental relief, including injunctive relief").  It simply

means that a declaratory judgment and an injunction are separate forms of relief and satisfying the

requirements for relief under the Act does not on its own entitle a party to injunctive relief.  See

Roe v. Wade, 410 U.S. 113, 166 (1973) ("The Court has recognized that different considerations

enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief,

on the other.").

**D.      Requirements for a Permanent Injunction**

Finally, Mr. t'Bear argues that Mr. Forman has not satisfied the requirements for injunctive

relief.  The Court agrees.  A party seeking a permanent injunction must demonstrate: "(1) that it

has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages,

are inadequate to compensate for that injury; (3) that, considering the balance of hardships

between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public

interest would not be disserved by a permanent injunction."  *eBay v. MercExchange, LLC*, 547

U.S. 388, 391 (2006). Mr. Forman fails to show that he has suffered an irreparable injury.

As a general rule, strictly monetary harm "will not usually support injunctive relief." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). Mr. Forman asserts that he "*will* suffer irreparable injury if Mr. t'Bear is allowed to take steps to thwart Mr. Forman's collateral rights in the FairWay IP" because Mr. t'Bear cannot satisfy a monetary judgment, (*see infra* Section III.D.2). (Dkt. No. 226 at 32.) Mr. Forman argues that under such circumstances, "it is well within the Court's broad equitable discretion to issue an injunction to preserve the collateral for the loans that are basis for the Court's monetary judgment against Mr. t'Bear." (*Id.* at 31.)

To award the permanent injunction that Mr. Forman seeks, however, he must demonstrate that he "*has* suffered an irreparable injury." *See eBay*, 547 U.S. at 391 (emphasis added). He has not done so. Mr. Forman instead asserts, and the evidence at trial shows, only the possibility of future harm. The Court will not issue a permanent injunction on such grounds. Any injury Mr. Forman has suffered to date is not irreparable; it can instead be repaired by monetizing the FairWay IP (the loan collateral) to satisfy the amounts owed. The cases cited by Mr. Forman do not counsel a different result, as only three concern *permanent* injunctions and all involved patent infringement, not equitable claims for rescission. *See, e.g., eBay*, 547 U.S. 388; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011); *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007).

Further, a permanent injunction may interfere with another court's authority to adjudicate rights to the collateral. As this Opinion makes clear, this Court has not ruled on the priority of Mr. Forman's interest over any of the other persons or entities to whom Urso or the Fairway IP has been pledged as collateral. Another court may order Mr. t'Bear to do something with Urso or Fairway IP. That is a matter for Mr. Forman to address in whatever court is hearing that matter. And if, despite his promises, Mr. t'Bear again tries to hide assets from Mr. Forman, then Mr. Forman has state law remedies for such conduct. Accordingly, the Court declines in its discretion to impose the permanent injunction sought by Mr. Forman.

United States District Court
Northern District of California

38

1

## CONCLUSION

2      Under California law a party may rescind a contract for a material failure of consideration.

3   The Court finds that rescission of the MOU is warranted because Mr. t'Bear diluted his ownership

4   interest in Urso in direct contravention of the MOU's terms, and doing so constitutes a material

5   failure of consideration.  Accordingly, judgment must be entered in favor of Mr. Forman and

6   against Mr. t'Bear on the rescission for lack of consideration claim.

7      The Court will issue a separate judgment regarding all the claims in the lawsuit.  For

8   purposes of determining monetary damages related to Mr. Forman's breach of loan agreements

9   counterclaim, on or before February 21, 2020 Mr. Forman shall submit an updated calculation of

10  damages as of the date of this Opinion that is supported by a declaration.

11     This Order disposes of Docket Nos. 188, 194-97, 200-04, and 228.

12     **IT IS SO ORDERED.**

13  Dated: February 12, 2020

14

15  _____

16  JACQUELINE SCOTT CORLEY
    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28